929 P.2d 650 (1996)
D.H., Appellant,
v.
STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Appellee.
No. S-7590.
Supreme Court of Alaska.
December 20, 1996.
*651 James M. Hackett, Fairbanks, for Appellant.
D. Rebecca Snow, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.
Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

OPINION
RABINOWITZ, Justice.

I. INTRODUCTION

This is an appeal of an order adjudicating T.H. a child in need of aid pursuant to AS 47.10.010(a)(2)(F). The superior court determined that the child's mother D.H. was addicted to drugs at the time of her pregnancy, that she continues to be addicted, and that T.H. has been neglected by both D.H. and her father F.H. since birth. Based on the evidence before it, the court adjudicated T.H. a child in need and placed her in State custody for a period of up to two years. D.H. contends that T.H. was improperly removed from her custody and appeals the superior court's adjudication, asserting that there is insufficient evidence under AS 47.10.010(a)(2)(F) and Child in Need of Aid (CINA) Rules to support the superior court's determination.

*652 II. FACTS AND PROCEEDINGS

T.H. was born on July 5, 1995, to D.H. and F.H.[1] The newborn tested positive for cocaine when a urine toxicology screen was performed. The State took emergency custody of T.H. shortly after birth, based on this positive toxicology as well as concerns for T.H.'s safety should she remain in the care of an allegedly drug addicted mother.[2]
On July 17, 1995, D.H. signed a stipulation granting the Department of Health and Social Services (Department) custody of T.H. through October 8, 1995. With the agreement of D.H. and F.H., the State placed T.H. with Eva and John, the paternal grandparents.[3] For a few weeks D.H. resided with Eva and John and T.H. Thereafter, the parties came to an understanding regarding visitation which allowed D.H. and F.H. to take T.H. from her grandparents' home between 10:00 a.m. and 2:00 p.m. daily. D.H.'s visits were sporadic, though it "never reached a point where [visitation] wasn't happening at all."[4]
During this period the State attempted to assist D.H. in her expressed desire to participate in a substance abuse treatment program. This effort included various evaluations and programs, all of which D.H. left prior to completion. D.H.'s mother testified that D.H. stated "she wanted to go, but her  for some reason or another she'd say, but I'm not going to go if I can't have the baby. I'm not going to go if I have to go to group because I don't like talking."[5]
On September 25, 1995, the Department filed a Petition for Adjudication of Child in Need of Aid. Temporary State custody of T.H. was extended through completion of the hearing. On February 23, 1996, the superior court entered a judgment placing T.H. in the custody of the State for a period not to *653 exceed two years, pursuant to AS 47.10.080(c)(1).[6] In so doing the court found that D.H. suffers from a serious drug addiction that she is "not currently motivated to seriously address or resolve." The superior court additionally determined that
[d]rugs and alcohol remain the single most important part of [D.H.]'s life.... [D.H.] is not motivated to care for or nurture [T.H.]. [D.H.]'s refusal to take part in these proceedings demonstrates a lack of interest on her behalf.... [D.H.] has neglected [T.H.] since [her] birth. There has been no real bonding efforts on [D.H.]'s part and no significant nurturing has taken place.... The evidence is clear and convincing that neither [D.H.] nor [F.H.] have provided [T.H.] with a home since [her] birth or displayed any sincere desire to do so. It is in [T.H.]'s best interest to be placed in the custody of the State of Alaska. [Eva and John] appear to be the appropriate custodians for [T.H.] however this matter has not been fully addressed or litigated in these proceedings.
The superior court's findings were later amended nunc pro tunc to reflect its determination that "[t]he State actively pursued efforts to prevent removal of [T.H.] from her parents and made reasonable efforts toward reunification." D.H. appeals the superior court's judgment granting custody of T.H. to the State.[7]

III. DISCUSSION

A. Did the State Present Sufficient Evidence for the Superior Court to Adjudicate T.H. a Child in Need of Aid Under AS 47.10.010(a)(2)(F)?[8]
D.H. argues that the State's evidence of abuse or neglect is insufficient to meet the threshold requirements of AS 47.10.010(a)(2)(F).[9] In interpreting this statute, we have said that the legislature intended that the State "assume custody of minors only to remedy severe parenting deficiencies and prevent significant harm to children." In re J.L.F. & K.W.F., 912 P.2d 1255, 1261 (Alaska 1996). D.H. asserts that the State failed to present sufficient evidence to make this showing.[10]
The State contends that the record fully supports the superior court's determination that T.H. was a child in need of aid as a result of her mother's neglect since birth. According to the State, the evidence before the superior court demonstrated
the mother's failure to make any sustained effort after her daughter was born to establish a parent-child relationship with [T.H.] by remaining available to provide for her daily care. The explanation for *654 [D.H.'s] neglect lay at least partially in her polysubstance abuse which had gone on for several years. Neither her pregnancy nor the birth of her daughter changed her priorities.
The superior court determined that by failing to take responsibility for T.H. or to make any appreciable effort to do so, D.H. substantially neglected her daughter. We conclude that the court had an ample evidentiary basis for adjudicating T.H. a child in need of aid pursuant to AS 47.10.010(a)(2)(F). Thus, the superior court's finding is not clearly erroneous.

B. Is the Superior Court's Finding that the State "Actively Pursued Efforts to Prevent Removal of [T.H.] from Her Parents and Made Reasonable Efforts Toward Reunification" Adequate under CINA Rules 15(g) and 17(c)(2) and Supported by Sufficient Evidence?[11]
Once the threshold jurisdictional determination called for by AS 47.10.010 is made, the superior court is required to make findings of fact under the appropriate CINA rules. D.H. asserts that the superior court's requisite CINA findings are not adequately supported by the evidentiary record.[12]
CINA Rule 15(g), governing the adjudication hearing, requires that in cases where the trial court authorizes removal of the child from the parent, the court make findings pursuant to 42 U.S.C. § 671(a)(15) "as to whether, under the circumstances of the case, reasonable efforts were made to prevent or eliminate the need for removal of the child from the home and to make it possible for the child to return to the home." Rule 15(g) (emphasis added).
CINA Rule 17(c)(2), regarding disposition of a child who has been adjudicated a child in need, requires additional findings of fact in cases involving an Indian child. Before removing the child from his or her parents,
[t]he court must find ... by a preponderance of the evidence that the party requesting removal of the Indian child has shown that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and that these efforts have proved unsuccessful.
Rule 17(c)(2) (emphasis added).[13]
The State concedes that in its initial preparation of the written findings and order, the superior court "overlooked" the provisions of CINA Rules 15(g) and 17(c)(2) that require it to make explicit determinations related to services provided to the family. Upon a motion by the State the superior court entered an amended order which included a finding related to the State's efforts. The State claims that this amendment rectified the superior court's initial oversight.[14]
D.H. asserts that the superior court's inclusion of these required findings was "simply *655 pro forma, and not supported by the evidence." She alleges that the State wrongly assumed emergency legal custody of T.H. immediately following birth, contending that the State's action was based solely on "unsupported concern ... for what the mother might do in the future (or might never do)." D.H. further claims that subsequent to this emergency legal custody, "[t]he Division apparently made no efforts whatsoever to leave the infant with her mother."
The State correctly asserts that "[t]he primary obstacle to the mother having custody of the child was her substance abuse," and describes in detail the evidence pertaining to its efforts to arrange for D.H.'s admission to a treatment program.[15] Based upon our review of the relevant evidence, we conclude that there is substantial evidentiary support for the superior court's findings under CINA Rules 15(g) and 17(c)(2). In short, the State's attempts to assist D.H. in enrolling and completing drug rehabilitation programs qualify as "active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."

C. Were the Superior Court's Findings Adequate on the Issue of Likely Serious Physical or Emotional Damage to T.H. if She Were Placed in Her Mother's Custody?[16]
Under CINA Rule 15, the State has the burden of proving by a preponderance of the evidence that the child is in need of aid. When the case involves an Indian child the court must also find "based on clear and convincing evidence, including the testimony of qualified expert witnesses, that custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Rule 17(c)(2) (emphasis added).[17]
D.H. contends that the superior court's finding regarding the likelihood of serious harm is not supported by the evidence.[18] In particular she argues that the testimony of the State's only expert witness, Kaye Wallis,[19] is insufficient to carry the State's burden. D.H. characterizes Wallis's testimony as follows:
Wallis described the matter [sic] as "an excellent mother" when she was not using drugs. Wallis did not know the nature and extent of the mother's drug problem, if any. Wallis conceded that the infant's grandparents were part of the infant's traditional and cultural home. The mother would have had this cultural support system in place, independent of the State's involvement.... Wallis herself never articulated with any conviction that either of the mother's two children was "likely to suffer physical or emotional damage" if left in the mother's custody.[[20]]
Apart from challenging the sufficiency of the expert's testimony, D.H. asserts that the *656 State's additional witnesses did not present clear and convincing evidence that T.H. would likely suffer substantial harm if left in the custody of D.H. In support of this contention D.H. points to medical records suggesting that during hospitalization the mother properly cared for T.H.; John's testimony that in his view D.H. loves her child; and T.H.'s social worker's admission that she had never seen D.H. with the child and thus had no information as to how D.H. cares for her.
The State claims that the evidence before the court fully satisfies the requirements of CINA Rule 17.
[Wallis] testified that D.H.'s "chemical dependency" created concerns that T.H. would suffer serious physical or emotional damage if she were left in her mother's care. She based her opinion on her realization that a chemically dependent person is not able to put her child first or to care properly for her.
The other evidence at trial supports Ms. Wallis's opinion. D.H. argues that because the mother handled the baby acceptably in the hospital for a day with the help of the nursing staff, T.H. was not at risk for physical or emotional damage in her mother's care. She would have the court ignore the fact that if T.H. were discharged from the hospital to her mother's custody, T.H. would no longer have had the assurance of professional adults supervising her care or even of other sober and attentive adults. Neither of T.H.'s grandparents thought she would be safe with her mother until D.H. controlled her drug problem.
With respect to the likelihood that T.H. would suffer serious damage if left in D.H.'s custody, we conclude that although there was arguably support for such a conclusion in the record, the superior court never made a determination which specifically addressed the requirements of the ICWA and CINA Rule 17(c)(2). The nearest formulation is the superior court's finding that "[t]he evidence is clear and convincing that neither [D.H.] nor [F.H.] have provided [T.H.] with a home since her birth or displayed any sincere desire to do so." The State attempts to equate this finding with the conclusion that "placing T.H. in the custody of D.H. would have likely led to serious physical or emotional damage to her." And yet the State implicitly acknowledges that the two findings are hardly synonymous, stating that "[e]ven if the trial court's formulation of [its] conclusion was inartful, it can be upheld on the basis of the evidence in the record as a whole."
Given that the superior court made no specific findings which focused explicitly on this issue of likelihood of future harm, as well as the importance of such a determination, we believe that question should be remanded to the superior court. On remand the superior court is directed to enter findings of fact which specifically address the criteria of CINA Rule 17(c)(2) and 25 U.S.C. § 1912(e).[21] Pursuant to our remand the superior court has the discretion to conduct such supplementary proceedings it deems appropriate. In order to expedite the resolution of this case we retain jurisdiction of the matter and direct the superior court to forward to this court its supplemental findings of fact within thirty days of the date of this opinion.

IV. CONCLUSION

The superior court's decision is AFFIRMED in part and REMANDED in part. The case is REMANDED to the superior court for the purpose of permitting that court to enter supplemental findings of fact under *657 CINA Rule 17(c)(2) and 25 U.S.C. § 1912(e). Jurisdiction of this appeal is RETAINED.[22]
FABE, Justice, dissenting.
I dissent from the court's conclusion that the superior court did not satisfy the requirements of Alaska Child in Need of Aid Rule 17(c)(2) and the Indian Child Welfare Act (ICWA). The record is replete with evidence of D.H.'s serious drug addiction and the detrimental effects that this addiction has had on her relationship with T.H.
When D.H. visited the emergency room during her pregnancy, she had needle tracks on both arms and admitted using cocaine and marijuana. The treating physician was so concerned for the safety of D.H. and the fetus that he arranged to hold D.H. in the hospital for seventy-two hours.
After T.H.'s birth, the State placed T.H. in the paternal grandparents' home so that D.H. could maintain contact with the child. However, the record demonstrates that D.H. visited only sporadically and that when she did so, she was not particularly attentive to the baby. By the time of trial, D.H. had departed for Barrow, without providing the paternal grandparents with any means of contacting her.
The record also reveals that D.H. repeatedly failed to follow through with drug rehabilitation, even though doing so could have allowed her to be reunited with T.H. Indeed, D.H. left three residential treatment programs against staff advice within a five-month period, without making any significant progress toward recovery.
At trial, ICWA expert Kaye Wallis, who was acting as a consultant for T.H.'s tribe, was asked whether T.H. would be at risk of serious physical or emotional damage if she were left in the care of D.H. Wallis responded that the tribe "would have concerns ... because of [D.H.'s] chemical dependency." Thus, she concluded that D.H. "cannot at this time care for her child without seeking treatment." In particular, Wallis was troubled by the fact that because of D.H.'s drug addiction and the priority that drugs were taking in her life, T.H. would lack "consistency in ... care," leading to "dysfunction[al]" emotional health.
The superior court recognized all of this evidence when it drafted its written findings. It noted that D.H. had more concern for drugs and alcohol than for T.H., and it concluded that due to her drug addiction, D.H. had repeatedly demonstrated that she "is not motivated to care for or nurture" T.H.
I cannot agree that these findings are inadequate. In a recent child custody case, we recognized that a trial court's findings are important because they permit us to review the factual and legal steps in the trial court's decision. Bird v. Starkey, 914 P.2d 1246, 1249 (Alaska 1996). Consistent with this conclusion, we stated that findings "need not be extensive" if they allow us to glean from the record the considerations underlying the trial court's decision. Id. at 1249 n. 4. For example, in Julsen v. Julsen, 741 P.2d 642, 649 n. 10 (Alaska 1987), we noted that the trial court did not make express findings on all statutorily mandated factors. Nevertheless, we affirmed its decision because "the record reflect[ed] that [the trial court] ... considered those factors pertinent to the case" and had reached "a sound decision." Id. We concluded that a custody determination need not be overturned "merely because a judge fails to tally the statutory factors like runs, hits and errors in a box score." Id.
Although Judge Beistline may not have made an express finding that return of T.H. to her mother at this time would be "likely to result in serious emotional or physical damage" to T.H., he gave careful consideration to the record, which established that D.H. was placing her need for drugs above the needs of her baby. Judge Beistline recognized that D.H. made drugs her highest priority and that she was not taking the steps to recover from her addiction so that she might care for her child. He also determined that D.H. had "neglected" T.H. since her birth, noting that "[t]here has been no real bonding effor[t] on [D.H.'s] part and no significant nurturing has taken place." His findings on these issues *658 were tantamount to a determination that T.H. would likely suffer serious emotional or physical damage if returned to her mother. Indeed, given the trial court's findings, it would be hard to imagine how T.H.'s emotional and physical well-being would not be at serious risk if she were placed in the care of D.H. These findings are consistent with the evidence in the record, which establishes that D.H.'s chemical dependency substantially interferes with her motivation and ability to care for T.H. Therefore, I would affirm the superior court's decision.
NOTES
[1] T.H. is an Indian child within the meaning of the federal Indian Child Welfare Act (ICWA). 25 U.S.C. § 1911 et seq.
[2] After receiving a referral from the hospital informing the State of T.H.'s positive toxicology, an investigation revealed that D.H. had been treated in the hospital emergency room in March 1995, at which time she admitted using both cocaine and marijuana. Needle track marks on both arms indicated chronic drug use, and D.H. appeared to be under the influence of a controlled substance. A toxicology screen confirmed the presence of both marijuana and cocaine.
[3] At the time of the CINA adjudication, T.H.'s placement with Eva and John had been continuous. What apparently motivated the State to file its CINA petition was the fear that D.H. would increasingly assert her legal rights as parent, to the detriment of T.H., were these rights not curtailed. The State indicated as much in the proceedings below:

[I]f the court dismisses this petition and does not end up ordering the child into somebody's custody, the child goes back to the parents['] custody. And even though the child would stay with [Eva and John] until the parents showed up on the doorstep and asked for the child ..., they couldn't keep the child from the parents.... Entirely how much influence, how much persuasion can the grandparents bring to bear on the parents to leave the child where she would best be cared for. We would submit that the evidence is pretty strong with regard to Samantha [D.H.'s other daughter] that the parents have not been willing to leave her where she would be better cared for, that is with the grandmother. They have dropped her off there when it was convenient for them and then they've come and picked her back up again and they've dropped her off there again and then they've picked her up there  from there again. And it's entirely based on their whims and convenience and it is our position ... that kind of treatment of this age child is going to cause her emotional damage.
[4] Regarding this period of time, the superior court stated in its factual findings that D.H. made "no real bonding efforts" and that "no significant nurturing" took place. The superior court also determined:

Immediately after her birth, [T.H.] was placed by the State in the custody of her paternal grandparents.... [They] have cared well for [T.H.] and have bonded with her. Their successes, however, are not due at all to either [F.H.] or [D.H.]. [The parents] cannot assume credit for the efforts of John and Eva [], nor can their neglect be justified or excused by the good works of [T.H.]'s grandparents. The "home" in which [T.H.] now resides is the home of John and Eva []. It is not the home of [D.H.] or [F.H.]. To suggest that [D.H.] and [F.H.] have provided a home for [T.H.] is factually unfounded, ignores the role of the State, and gives [D.H.] and [F.H.] far more credit than they are entitled to.
[5] The discharge summaries from D.H.'s treatment efforts indicate that she was concerned with access to her child while participating in inpatient treatment. Other factors possibly contributing to D.H.'s premature departures from the programs are alluded to throughout the summaries.
[6] AS 47.10.080(c) reads:

If the court finds that the minor is a child in need of aid, it shall
(1) order the minor committed to the department for placement in an appropriate setting for a period of time not to exceed two years ... except that the department may petition for and the court may grant in a hearing (A) two-year extensions of commitment that do not extend beyond the minor's 19th birthday if the extension is in the best interests of the minor and the public....
[7] D.H. has another child, Samantha, born April 14, 1991. At the time of the hearing Samantha was in the custody of D.H. Her custody is not at issue in this case. Nor is the parental fitness of F.H. at issue on appeal.
[8] This court reviews adjudication decisions and the factual findings that support them under the clearly erroneous standard, unless they raise questions of statutory interpretation. E.g., In re J.L.F. & K.W.F., 828 P.2d 166, 170 n. 12 (Alaska 1992).
[9] AS 47.10.010 reads in relevant part:

Jurisdiction. (a) Proceedings relating to a minor under 18 years of age residing or found in this state are governed by this chapter, except as otherwise provided in this chapter, when the court finds the minor
.....
(2) to be a child in need of aid as a result of
.....
(F) the child having suffered substantial physical abuse or neglect as a result of conditions created by the child's parent, guardian, or custodian.
[10] The only argument that D.H. makes to support this claim is that T.H. was born, and continues to be, a physically healthy child. As the statute and this court's treatment of it make abundantly clear, however, the superior court is not meant to confine its inquiry to the physical well-being of the child.
[11] Whether the findings were adequate to satisfy the CINA rule is a question of law. This court interprets statutory language and rule language, such as the requirements of the CINA rules at issue in this case, de novo. Langdon v. Champion, 745 P.2d 1371, 1372 n. 2 (Alaska 1987). The question of whether the findings were erroneous is reviewed for clear error. A.H. v. State, 779 P.2d 1229, 1231 (Alaska 1989).
[12] D.H. argues in particular that the trial court's findings under CINA Rule 10 are unsupported by the evidence. However, as noted by the State,

[t]he trial court did not claim to make any findings under CINA Rule 10 nor was it asked to. CINA Rule 10 relates to temporary custody hearings. CINA Rule 15 controls adjudication decisions like the one appealed from this case and CINA Rule 17 controls disposition decisions.
In any case, since "Rules 15 and 17 do include substantive requirements similar to those in CINA Rule 10 that D.H. argues were not proved," the State proceeds to address the substantive arguments made by D.H. as if they reference the appropriate CINA Rule. We treat D.H.'s claims in a similar manner.
[13] This language is derived from the ICWA at 25 U.S.C. § 1912(d), which reads:

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
[14] The superior court simply amended its order to include one additional finding of fact: "The State actively pursued efforts to prevent removal of [T.H.] from her parents and made reasonable efforts toward reunification." See R.R. v. State, 919 P.2d 754, 756 (Alaska 1996) (rejecting a claim that a superior court's findings as to reasonableness were inadequate solely because they were only "mentioned in passing" and holding that "CINA Rule 15(g) does not require that each element of the `reasonable efforts' be discussed individually and in detail.").
[15] The State also contends that it made efforts more directly targeted at preventing the breakup of the family. It notes that the Department placed T.H. in the home of relatives, "where the mother could have stayed with her, participating in her daily care and establishing the parent-child relationship the family needs."

Further efforts described by the State specifically intended to foster the development of a relationship between D.H. and T.H. were attributable to the child's grandparents  not to the State  and thus are relevant only to the extent they suggest that certain actions not taken by the State might have been duplicative.
[16] Whether the findings were adequate to satisfy the CINA rule is a question of law. This court interprets statutory language and rule language, such as the requirements of the CINA rules at issue in this case, de novo. Langdon v. Champion, 745 P.2d 1371, 1372 n. 2 (Alaska 1987). The question of whether the findings were erroneous is reviewed for clear error. A.H. v. State, 779 P.2d 1229, 1231 (Alaska 1989).
[17] The ICWA mandates that this determination be made. 25 U.S.C. § 1912(e).
[18] D.H. incorrectly makes this claim under CINA Rule 10(c)(3)(B), which is identical to the applicable Rule 17(c)(2).
[19] Wallis is an ICWA specialist and consultant for the Native Village of Ft. Yukon.
[20] In fact, when asked whether there would be a risk to T.H. "of serious physical or emotional damage" if left in D.H.'s care, Wallis answered: "Yes, during the time of her chemical dependency." Noting that D.H. "take[s] her child out of the environment" when she uses drugs, Wallis added that "when the focus is on getting the next fix or the next high ... she cannot at this time care for her child without seeking treatment."
[21] See In re J.L.F., 828 P.2d 166, 172 (Alaska 1992) (holding that CINA Rule 15(g) requires an explicit finding of reasonableness). We believe that CINA Rule 17(c)(2) requires a similarly explicit finding regarding the likelihood of serious physical or emotional damage to the child. See, e.g., K.N. v. State, 856 P.2d 468, 475 (Alaska 1993) (upholding the trial court's express finding that "the evidence shows beyond a reasonable doubt that the children would continue to suffer substantial and serious harm in the future, physical and emotional, if they were placed with [the father].").
[22] Our disposition of the issues discussed above obviates the need to address any of the other issues raised in this appeal.