968 P.2d 93 (1998)
O.R., Appellant,
v.
STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Appellee.
C.R., Appellant,
v.
STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Appellee.
Nos. S-8225, S-8235.
Supreme Court of Alaska.
November 27, 1998.
*94 Bethany P. Spalding, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant O.R.
Robert S. Noreen, Law Office of Robert S. Noreen, Fairbanks, for Appellant C.R.
D. Rebecca Snow, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.
Thomas E. Fenton, Fairbanks, Guardian Ad Litem.
Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

OPINION
FABE, Justice.

I. INTRODUCTION

This appeal arises out of the superior court's finding that A.R. was a child in need of aid under AS 47.10.010(a)(6) because she suffered substantial physical neglect. A.R.'s parents, C.R. and O.R., contend that subsection (6) requires the State to show both that they physically neglected A.R. and that A.R. was physically harmed by their neglect. Because we previously held in D.H. v. State, *95 Department of Health & Social Services[1] that subsection (6) does not require a finding of actual harm, we affirm.

II. FACTS AND PROCEEDINGS

C.R. (formerly C.K.) is A.R.'s mother and O.R. is A.R.'s father. They were previously before this court in O.R. v. State, Department of Health & Social Services,[2] in which they appealed the termination of their parental rights over A.R.[3] We discussed the relevant facts and proceedings in that appeal as follows:
A.R. was born nine weeks prematurely on June 11, 1994. She tested positive for cocaine and suffered from respiratory difficulties, including strep pneumonia. Because of her health problems, she remained in the hospital's neo-natal intensive care unit until July 5, 1994, and required hospitalization three more times in the next four months. A year after her birth, A.R. underwent surgery to correct her breathing difficulties. The surgery minimized most of her respiratory problems, but she remains vulnerable to serious illness and attention disorders.
A.R. is C.K.'s eighth child. The two children born to C.K. prior to A.R. also tested positive for cocaine at birth. DHSS removed all of C.K.'s other children in 1991 and 1992 and placed them under the guardianship of relatives in other states. O.R. has two other children who live with their mother in another state. O.R. and C.K. are not married.
DHSS initially took emergency custody of A.R. on June 13, 1994, two days after her birth, because she tested positive for cocaine. On June 15, 1994, in response to a petition by DHSS, C.K. and O.R. stipulated to ninety days temporary custody with the state. The court extended custody at a review hearing on September 13, 1994, until a trial on November 28, 1994, on DHSS's petition for adjudication of A.R. as a child in need of aid (Adjudication Trial).
There was little visitation between A.R. and her parents in the more than five months between A.R.'s birth and the adjudication trial. Although C.K. and O.R. appear to have visited the child regularly during the three weeks that she remained in the hospital after her birth, their visits almost entirely ceased after she was discharged. Between July 5 and November 28, C.K. visited only twice, once in July and once in September, and O.R. visited only once, accompanying C.K. on the July visit.
In its findings and order following the November 28, 1994 trial, the superior court stated that it found this "lack of visitation by either parent ... troubling because it means that neither of them could possibly have established a relationship with A.R. with so little contact." The court further noted A.R.'s "special medical needs which require careful attention and care from her primary care takers" and stated that "[n]either [C.] K. or [sic] [O.] R. is capable of providing that level of attention and care at this time."
Based on these findings, the court determined that A.R. was a child in need of aid "in that she has no one able or willing to care for her at this time and she has effectively been abandoned, whether or not her parents' abandonment of her was conscious or intended." The court awarded custody of A.R. to DHSS for one year. In its order, the court stated that "[i]t is essential that each parent get treatment for his or her own needs as soon as possible and begin to establish contact with the child so that they can learn what her needs are and how to provide for them." Furthermore, a stipulation signed by O.R. and given to C.K.'s attorney stated that DHSS would "consider filing a petition to terminate parental rights" if C.K. and O.R. had not made "progress toward being able to demonstrate [they are] capable of caring for" A.R.
Despite this warning, however, C.K. did not visit A.R. in the next five months. She also failed to follow through on a recommendation *96 to obtain treatment for her substance abuse problem. On April 29, 1995, C.K. was arrested for violation of probation and selling cocaine. At the time of the termination trial she was incarcerated and awaiting sentencing.
Shortly after the adjudication trial, O.R. was arrested and incarcerated until February 5, 1995. While in jail, he had one visit with A.R. in January 1995. After his release from jail, however, he did not visit A.R. until he was again incarcerated in May 1995 on charges of sexual abuse of a minor, distributing alcohol to a minor, and misconduct involving weapons.
There were occasional obstacles to visitation during the time between A.R.'s initial discharge from the hospital and the time at which both parents were incarcerated. Between December 6 and December 20, C.K.'s social worker was on leave, and between December 16 and January 1, A.R. left the state with her foster parent. DHSS also canceled several visits in January for reasons beyond C.K. and O.R.'s control. This left, however, approximately seventy-seven scheduled visits that C.K. missed when she was not in jail and about seventy scheduled visits O.R. missed when he was not in jail.
In the five months after they were both incarcerated, C.K. and O.R. each had three visits with A.R. Bureaucratic delays, A.R.'s surgery in June, and a trip to Florida with her foster parents apparently made it impossible for A.R. to visit the jail more frequently.
On June 1, 1995, DHSS filed a Petition for Termination of Parental Rights, alleging abandonment. After a five-day trial beginning October 30, 1995, Judge Mary E. Greene terminated the parental rights of C.K. and O.R. and placed A.R. in the custody of DHSS for the purpose of finding her a permanent home.[4]
We affirmed the superior court's ruling that C.R. and O.R. had physically abandoned A.R. under former AS 47.10.010(a)(2)(A), and remanded for additional findings as to whether relatives of A.R. were willing and available to care for her.[5]
Following the remand, Superior Court Judge Mary E. Greene allowed the State to withdraw the ground of abandonment and assert the ground of physical neglect under AS 47.10.010(a)(6)[6] as the basis for adjudicating A.R. a child in need of aid. An evidentiary hearing was held on June 17, 1997. The next day, the superior court announced from the bench its decision to terminate O.R.'s and C.R.'s parental rights based on its finding of substantial neglect. On July 11, 1997, the court entered an order terminating parental rights under subsection (6).
O.R. appealed the superior court's order. The State then moved for a remand of the appeal in light of our recent decisions in R.J.M. v. State[7] and A.M. v. State.[8] We remanded the matter to the trial court for the purpose of (1) reviewing the July 11, 1997 order in light of our recent decisions, or (2) indicating that no such review and reconsideration was necessary.
On remand, the superior court found that review and reconsideration were not necessary. But "in an abundance of caution," the superior court clarified its July 11, 1997 order, emphasizing that because A.R.'s parents had "not provided for her physical needs," A.R. had suffered substantial physical neglect under subsection (6). C.R. and O.R. appeal the superior court's finding, arguing that A.R. never suffered harm as a result of conditions created by them. Their appeals have been consolidated.

III. DISCUSSION

A. Standard of Review

We review the superior court's factual findings on the issue of termination under *97 the clearly erroneous standard.[9] Factual findings are clearly erroneous if "review of the entire record leaves this court with a definite and firm conviction that a mistake had been made."[10] Whether the superior court's findings comport with AS 47.10.010(a)(6) is a question of law that we review de novo.[11] We are aware that termination of parental rights is "a drastic measure. The private interest of a parent whose parental rights may be terminated is of the highest order."[12]

B. The Superior Court Did Not Err by Ruling that A.R. Suffered Substantial Physical Neglect under AS 47.10.010(a)(6).

Under AS 47.10.010(a)(6), a court may find a minor to be a child in need of aid because the child has "suffered substantial physical abuse or neglect as a result of conditions created by the child's parent, guardian, or custodian." C.R. and O.R. contend that subsection (6) requires a showing that "the child was physically harmed in determining whether the child has suffered physical neglect." They also maintain that because A.R. has been in state care for most of her life, even if she was physically harmed, it was the department, not her parents, that breached its duty to care for her. We disagree with both contentions.
D.H. v. State, Department of Health & Social Services[13] controls our analysis. The facts of the case at hand closely resemble those in D.H. When T.H. was born to D.H., T.H. tested positive for cocaine. The State took emergency custody of T.H. shortly after birth because of her positive toxicology and concerns for her safety.[14] With her parents' approval, T.H. was placed with her grandparents. Although D.H. was allowed to visit T.H. daily, her visits were sporadic and the superior court stated that D.H. made "no real bonding efforts" and that "no significant nurturing" occurred.[15] Despite its finding that T.H. was well cared for by her grandparents,[16] the superior court determined that T.H. was a child in need of aid under AS 47.10.010(a)(6).[17] D.H. appealed, arguing that the State's evidence of abuse or neglect was insufficient under subsection (6).[18] In urging affirmance, the State contended that D.H. had failed to make any sustained effort "to establish a parent-child relationship with [T.H.] by remaining available to provide for her daily care."[19] We held that D.H.'s conduct supported the superior court's finding of substantial neglect:
The superior court determined that by failing to take responsibility for T.H. or to make any appreciable effort to do so, D.H. substantially neglected her daughter. We conclude that the court had an ample evidentiary basis for adjudicating T.H. a child in need of aid pursuant to [AS 47.10.010(a)(6) ]. Thus, the superior court's finding is not clearly erroneous.[20]
Significantly, we did not require the State to show that T.H. was harmed by D.H.'s neglect. Instead, we upheld the finding of physical neglect under subsection (6) based upon D.H.'s conduct and despite D.H.'s claim that T.H. was "a physically healthy child."[21] Our inquiry focused on D.H.'s neglectful conduct, not on whether her conduct actually harmed T.H.
In the case at hand, the superior court similarly concluded that A.R. suffered *98 substantial physical neglect because her parents "have not provided for her physical needs for any period during her life." The superior court emphasized that A.R.
went from the hospital into foster care because of the actions of her parents in failing to provide for her physical needs. They did not learn how to care for her respiratory problems while she was in the hospital. They did not visit her to provide the physical touching needed by a newborn. They did not learn how to care for her respiratory problems after her release from the hospital; they could not meet her physical medical care needs.
Moreover, the superior court determined that "[w]hile [A.R.] remained in foster care, her parents continued to ignore all her needs, including her physical needs. They did not attempt to make efforts to gain physical custody so that they could provide for her physical needs. They did not even maintain visits." Thus, the court concluded that O.R. and C.R. "substantially neglected the physical needs of [A.R.]" and that she "has thus suffered substantial physical ... neglect as a result of conditions created by the child's parents.... They did not feed her, house her, take her to the doctor or the hospital, bathe her, or provide for her physical care. They completely neglected her physical needs."
Like D.H., C.R. and O.R. have failed "to take responsibility for [A.R.] or to make any appreciable effort to do so."[22] According to the superior court, they were not "responsive to [A.R.'s] needs," failed to establish any parent-child bond and were not "there for [her] in any sense of the word" during her first few months of life. In light of these circumstances, we conclude that the superior court's finding of substantial physical neglect under subsection (6) is entirely consistent with our holding in D.H. and not clearly erroneous.
The dissent believes that the conduct of O.R. and C.R. cannot support a child-in-need-of-aid finding under subsection (6) because "[t]he State did not present any evidence that A.R. suffered or was at risk for substantial physical harm as a result of her parents' actions or omissions...." Dissent at 21. In support of this position, it points to the holding of R.J.M. v. State[23] that subsection (6) concerns only substantial physical neglect, not emotional neglect. But R.J.M. did not overrule the holding of D.H., and in the case before us, the superior court specifically found that A.R. "suffered substantial physical neglect by her parents," as required by R.J.M.
Moreover, our examination and discussion of the common definitions of the terms "abuse" and "neglect" in R.J.M. support our conclusion that a child need not have experienced physical harm to have suffered physical neglect. As we noted in R.J.M., "`abuse' and 'neglect' are corollary terms. Both imply the potential for infliction of harm; the former word generally denotes potentially harmful action, while the latter generally denotes potentially harmful inaction."[24] Thus, the emphasis of the inquiry is on the possibility of harm to the child due to neglectful parental conduct, not on the harm itself. Under subsection (6), the State is not required to wait to intervene until a child has been harmed; rather, the provision's use of the term "neglect" indicates that parental conduct causing the potential for harm suffices to trigger state action. Certainly A.R. suffered the potential for infliction of physical harm due to the neglectful conduct of her parents and their utter failure to meet or make provision for her physical needs.[25]
C.R. and O.R. also argue that because A.R. has been in state care for most of her life, any harm she suffered resulted from the State's breach of its duty to A.R., not from *99 their negligence. Given our conclusion that under subsection (6) A.R. may be adjudicated a child in need of aid based on her parents' neglectful conduct without regard to whether she was actually harmed, this argument fails.

IV. CONCLUSION

The superior court's finding that A.R. is a child in need of aid pursuant to AS 47.10.010(6) and its order terminating the parental rights of C.R. and O.R. are AFFIRMED.
EASTAUGH, J., concurring.
MATTHEWS, C.J., with whom COMPTON, J., joins, dissenting.
EASTAUGH, Justice, concurring.
I write separately to join in the court's conclusion that A.R. was a child in need of aid under AS 47.10.010(a)(6). Today's case again illustrates the difficulty, if not impossibility, of drawing a bright line between physical and emotional neglect. That is not a line I think the legislature intended to draw when it enacted subsection (6).[1] But just as stare decisis requires us to adhere to R.J.M. v. State, where the court held that subsection (6) does not apply to emotional neglect, it also requires us to adhere to D.H. v. State, Department of Health & Social Services.[2] Today's opinion follows the precedent of D.H. and respects the distinctions drawn in R.J.M. I therefore join in it.
MATTHEWS, Chief Justice, with whom COMPTON, Justice, joins, dissenting.
Today's opinion holds that A.R. is a CINA[1] under AS 47.10.010(a)(6) because her parents, O.R. and C.R., abandoned her into State custody. Op. at 95, 96-99. I dissent because in my view the State failed to prove that A.R. suffered substantial physical neglect, required under subsection (6). Further, I think that the court improperly relies on evidence of emotional neglect, in contravention of our recent decision in R.J.M. v. State, 946 P.2d 855 (Alaska 1997). And I question whether after today's opinion, a meaningful difference will exist between AS 47.10.010(a)(6) and the abandonment provision in AS 47.10.010(a)(1). I address each point in turn.
The court interprets D.H. v. State, Department of Health & Social Services, 929 P.2d 650 (Alaska 1996), to focus on whether the parents have neglected the child, rather than whether the child has suffered neglect. Slip Op. at 96-98. In my view, the text of the statute does not support this interpretation. Under subsection (6), a child may be adjudicated a CINA if "the child ha[s] suffered substantial physical abuse or neglect as a result of conditions created by the child's parent." AS 47.10.010(a)(6). In R.J.M. we held that the phrase "substantial physical" modifies both "abuse" and "neglect." 946 P.2d at 862-68. Thus, to adjudicate A.R. a CINA under subsection (6), the superior court must find that she has suffered "substantial physical ... neglect." To "suffer" means to "undergo" or "endure." Webster's *100 Third New International Dictionary (1969). Thus, I believe that the child must have "undergone or endured substantial physical... neglect" to be adjudicated a CINA.
In R.J.M. we held that the focus of subsection (6) is on the harm to the child. 946 P.2d at 864. We emphasized that subsection (6) is "aimed at a distinct and relatively narrow problem: physical harms resulting from abuse or neglect." Id. This, of course, is consistent with the text of the statute which provides that neglect or abuse must have been suffered as a result of the parents' conduct. We expressed our agreement with the parents' interpretation of subsection (6) that it "reaches only physical harm." Id. at 862.
We also stated that the statutory terms "abuse" and "neglect" "imply the potential for infliction of harm; the former word generally denotes potentially harmful action, while the latter generally denotes potentially harmful inaction." Id. Although we did not focus on the possible conflict between our statement that subsection (6) is aimed at "physical harms resulting from abuse or neglect," id. at 864, and our statement that abuse or neglect imply the potential for infliction of harm, the two statements are reconcilable. What is required is that a parent must have failed to ensure that a child is provided with such necessities as food, shelter, clothing, or medical attention. The child need not actually be physically harmed by this neglect, but the potential for substantial physical harm must be present. Substituting R.J.M.'s definition of "abuse or neglect" for those terms, subsection (6) would provide that the child must have "suffered substantial physical [potentially harmful action or inaction] as a result of conditions created by the child's parent." In other words, the child must at least have been placed at risk of substantial physical harm as a result of the parent's conduct.
I do not read D.H. v. State to compel a different result. In D.H. the State took custody of the child twelve days after her birth. 929 P.2d at 652. The superior court adjudicated her a CINA under subsection (6), citing D.H.'s failure to nurture, bond, and maintain visitation with her. Id. at 653. We agreed that because D.H. failed "to take responsibility for T.H. or to make any appreciable effort to do so, D.H. substantially neglected her daughter." Id. at 654. In footnote 10 of D.H., we rejected D.H.'s argument that because T.H. "was born, and continues to be, a physically healthy child," she could not be adjudicated CINA. Id. at 653 n. 10. We said that "the superior court is not meant to confine its inquiry to the physical well-being of the child." Id.
Today's opinion reads footnote 10 of D.H. to support its conclusion that only the parents' actions need be considered under AS 47.10.010(a)(6). Op. at 97. But our more recent decision in R.J.M. undermines this interpretation. In R.J.M. we observed that the D.H. footnote "plainly referred to the CINA statute as a whole, not just to subsection [(6) ]" and "stands at most for the proposition that the physical well-being of a child at any given time cannot be determinative of whether the child has suffered substantial abuse or neglect." 946 P.2d at 866 n. 12 (emphasis added). But today's opinion reads footnote 10 of D.H. to be an interpretation of subsection (6) standing for the proposition that the focus of that subsection is on the parent's neglectful conduct rather than the results of that conduct. Op. at 97. This reading is inconsistent with the explanation of D.H. which we gave in R.J.M. and cannot be squared with our statement in that case that subsection (6) is aimed at "physical harms resulting from abuse or neglect." Id. at 864.
In light of R.J.M.'s explicit holding that subsection (6) concerns only substantial physical neglect, reliance on emotional neglect is no longer appropriate. The court today, however, relies on O.R.'s and C.R.'s failure to develop a meaningful parent-child bond with A.R. Op. at 98. It notes that, as in D.H., O.R. and C.R. failed to "`establish a parent-child relationship,'" to make "`real bonding efforts,'" or to provide "`significant nurturing.'" Op. at 97 (quoting D.H., 929 P.2d at 652 n. 4, 653). This reliance on emotional neglect runs counter to our decision in R.J.M.
In my view, it is necessary to read AS 47.10.010(a)(6) as requiring that the child suffer *101 physical neglect to distinguish subsection (6) from subsection (1) of the same statute.[2] Subsection (1) allows a court to adjudicate a child CINA if the child has "no parent, guardian, custodian, or relative caring or willing to provide care[.]" We have held that this subsection speaks to the parent's abandonment of the child. See O.R. v. State, Dep't of Health & Soc. Servs., 932 P.2d 1303, 1307-08 (Alaska 1997); S.A., 912 P.2d at 1241.
Abandonment is measured by a two-part test. First, the court must look to the "objective conduct of the parents in discharging their parental responsibility." O.R., 932 P.2d at 1307-08 (quoting A.M. v. State, 891 P.2d 815, 820 (Alaska 1995)). Second, the court must find that there has been "a destruction of the parent-child relationship." Id. at 1309 (quoting A.M., 891 P.2d at 821). In considering whether a parent has abandoned a child, the court may properly consider whether regular visitation has occurred, whether the parent has made efforts to communicate with the child, and the strength of the parent-child bond during the early years of the child's life.[3] Further, the court may properly consider evidence of mental and emotional harms. See R.J.M., 946 P.2d at 866. But under subsection (1), even if the parents have abandoned the child, the State must still prove that there is no other relative willing to assume care of the child. See O.R., 932 P.2d at 1309-11.
Although in R.J.M. we cautioned against reaching an "overarching interpretation" that might render another subsection superfluous,[4] today's opinion blurs any meaningful distinction between subsections (1) and (6). For example, if a child's parents recognize that they lack maturity or appropriate parenting skills, they may entrust their child's care to a relative. Even assuming that the relative provides the child with a physically healthy environment, it may be right to conclude that the parents have abandoned their child. But does this then justify terminating their parental rights? Under subsection (1), the answer is clearly no, because there is a relative who is caring for the child. But under today's opinion, the parents' decision to entrust their child's care to a more mature care giver may result in the permanent loss of their parental rights. This is so because the parents may have engaged in "neglectful conduct" under subsection (6).
Parental abandonment of a child to the care of another followed by a failure to visit or bond with the child is a typical fact pattern covered by subsection (1). But in such cases there is a requirement that there be no relative willing to care for the child before a CINA finding may be made. Today's opinion holds that such conduct is also covered by subsection (6). This subsection does not contain a requirement that there be no willing relative. It therefore signals the end of the willing relative requirement in classic abandonment situations. Such a result eliminates the policy choice made by the legislature to first place an abandoned child with a willing relative, before he or she is made a ward of the State. This result is also contrary to the principle of statutory interpretation that counsels against reading a statute in a manner in which provisions are rendered moot or superfluous. See In the Matter of S.A., 912 P.2d at 1241; R.J.M., 946 P.2d at 865.
The facts show that the State took custody of A.R. two days after her birth while she was still in the neonatal intensive care unit. O.R., 932 P.2d at 1306. Because the State assumed complete custody and control over A.R., it is obvious that O.R. and C.R. have not "provide[d] for her physical care" since her birth. Op. at 98. And as today's opinion notes, it is also true that O.R. and C.R. have failed to maintain regular visitation or contact with A.R. O.R. and C.R. have essentially *102 been absentee parents. This neglect may support a CINA finding under subsection (1), but not under subsection (6). The State did not present any evidence that A.R. suffered or was at risk for substantial physical harm as a result of her parents' actions or omissions, either during the two days following her birth or during the time that A.R. has spent in State custody.
I would therefore reverse the superior court's finding that A.R. was a child in need of aid under AS 47.10.010(a)(6).
NOTES
[1] 929 P.2d 650 (Alaska 1996).
[2] 932 P.2d 1303 (Alaska 1997).
[3] See id. at 1305.
[4] Id. at 1306-07.
[5] See id. at 1312.
[6] Pursuant to a 1996 amendment, former subsections (a)(2)(A)-(F) are now designated as AS 47.10.010(a)(1)-(6). Ch. 59, § 17, SLA 1996. For simplicity's sake, we will refer to the current statutory numbering.
[7] 946 P.2d 855 (Alaska 1997).
[8] 945 P.2d 296 (Alaska 1997).
[9] See R.J.M. v. State, 946 P.2d 855, 860-61 (Alaska 1997) (citation omitted).
[10] Id. at 861 n. 6 (citation omitted).
[11] See id. at 861 (citation omitted).
[12] In re J.L.F. & K.W.F., 828 P.2d 166, 170 (Alaska 1992) (citation omitted), overruled on other grounds by In re S.A., 912 P.2d 1235, 1239 (Alaska 1996).
[13] 929 P.2d 650 (Alaska 1996).
[14] See id. at 652.
[15] Id. at 652 n. 4.
[16] See id.
[17] See id. at 653.
[18] See id.
[19] Id.
[20] Id. at 654.
[21] Id. at 653 n. 10.
[22] D.H., 929 P.2d at 654.
[23] 946 P.2d 855 (Alaska 1997).
[24] 946 P.2d at 862 (emphasis added).
[25] The dissent also expresses concern that parents who have entrusted their child to the care of relatives in a "physically healthy environment" might be charged with neglectful conduct under subsection (6). But the definition of physical neglect discussed in R.J.M. clearly would not encompass this situation; such parental conduct could not be described as "potentially harmful inaction."
[1] See R.J.M. v. State, 946 P.2d 855, 871 (Alaska 1997) (Eastaugh, J., dissenting). The court there rejected my view that former AS 47.10.010(a)(2)(F), now AS 47.10.010(a)(6), applied if parents engaged in substantial emotional neglect with respect to their child.
[2] 929 P.2d 650 (Alaska 1996).
[1] CINA means a "child in need of aid." As we recently observed in E.M. v. State, Department of Health and Social Services, 959 P.2d 766, 768 (Alaska 1998):

The statutes and rules governing termination of parental rights require a number of determinations. Under AS 47.10.080(c)(3), termination is authorized
upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid [CINA] under AS 47.10.010(a) as a result of parental conduct and upon a showing in the disposition by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights.
Pursuant to this statute, the court first determines if there is clear and convincing evidence for a CINA adjudication based on one of the six grounds stated in AS 47.10.010[ (a)(1)-(6) ]. See Nada A. v. State, 660 P.2d 436, 439-40 (Alaska 1983). Then the court determines, still using the clear and convincing evidence standard, whether the child is in need of aid because of parental conduct and whether the parental conduct is likely to continue if parental rights are not terminated. See id. at 440.
[2] See In the Matter of S.A., 912 P.2d 1235, 1241 (Alaska 1996) ("as a general rule, [a] statute should be construed so that effect is given to all its provisions and no part is inoperative or superfluous, void or insignificant") (quoting Journey v. State, 895 P.2d 955, 959 n. 10 (Alaska 1995)).
[3] See, e.g., O.R., 932 P.2d at 1308-09; E.J.S. v. State, Dep't of Health & Soc. Servs., 754 P.2d 749, 750-51 (Alaska 1988); D.E.D. v. State, 704 P.2d 774, 783 (Alaska 1985); Nada A. v. State, 660 P.2d 436, 439 (Alaska 1983).
[4] R.J.M., 946 P.2d at 865.