**V.D., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Appellee.**

**No. S–8980.**

Supreme Court of Alaska.

Nov. 12, 1999.

Rehearing Denied Dec. 14, 1999.

Margi A. Mock, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Laura C. Bottger, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

### I.  INTRODUCTION

V.D. appeals an order adjudicating her six boys as children in need of aid under former AS 47.10.010(a)(6). The superior court determined that the children were in need of aid because V.D. left them with friends who, after three months, could no longer afford to care for them. V.D. also claims that she was denied her right to counsel and that the state failed to make active efforts to prevent the breakup of her Indian family. We reverse because we conclude that the state failed to prove that V.D.'s children were in need of aid at the time of the adjudication hearing.

### II.  FACTS AND PROCEEDINGS

On April 9, 1997, Roy Lenny Frye, a social worker for the Division of Family and Youth Services (DFYS) in Kenai, took emergency custody of V.D.'s six children.[1] In January 1997 V.D. had left the children with a close friend, Theresa Larson, and her husband, George, who had agreed to keep them for a month while V.D. found work and a home in Florida. Because of money problems, V.D. did not retrieve her children as planned; they stayed with the Larsons through February and March.

In early April V.D. sent money for the four youngest children to fly to Seattle accompanied by her friend Kenneth Bowen.[2] V.D. also purchased bus tickets for the children to travel with Bowen from Seattle to Florida. But the bus tickets did not arrive in Seattle on time, and the Larsons had to raise money to fly the children back to Alaska. Later that week, the Larsons brought the children to DFYS, stating that they could no longer afford to care for them without state assistance.

Frye took custody of V.D.'s six boys and filed a petition requesting the superior court in Kenai to adjudicate them as children in need of aid (CINA). The court held a temporary custody hearing on April 10, which V.D. attended by telephone from Florida. The court found probable cause to believe that the children were in need of aid because V.D. lived out of state and the Larsons were no longer willing or able to care for them. Without inquiring into the feasibility of immediately reuniting V.D. with her family, the court authorized placement of the children with relatives in Unalakleet and Nikiski.[3]

At the state's prompting, the court then advised V.D. of her right to counsel. After V.D. said she wanted an attorney, the trial court informed her that she would need to fill out and submit a form that the court would send her. It then scheduled an adjudication hearing for May 23.

Three days later, the court sent V.D. a form to establish her financial eligibility for court-appointed counsel; the form was returned for insufficient address, and the court sent it again on April 28. Because V.D. had not yet returned the form by May 23, the court postponed the adjudication hearing until June 27. When V.D.'s paperwork still had not arrived by then, the court provisionally appointed a public defender. After several further continuances, the court held the adjudication hearing in December 1997, eight months after the state took custody of the children.

---

1. The children are Indian children within the definition of the Indian Child Welfare Act. See 25 U.S.C. § 1903 (1994).

2. The two oldest children, who were in high school, planned to remain in Kenai until the school year ended.

3. One of these foster placements was unsuccessful, and the six children were eventually placed in five different foster homes.

At the adjudication hearing, the parties and the court focused almost exclusively on the situation that existed when the state assumed emergency custody—that is, V.D.'s conduct in leaving the children with the Larsons for three months. Based on evidence that merely elaborated on these earlier circumstances, the court ruled that the children were in need of aid because their mother had physically neglected them. The court scheduled a disposition hearing and ordered the children to remain in state custody pending disposition.[4]

Following disposition, V.D. filed this appeal.

## III. DISCUSSION

### A. Standard of Review

■ In a CINA case, we will overturn the superior court's findings of facts if they are clearly erroneous.[5] Whether the trial court's findings comport with the requirements of the CINA statutes and rules is a question of law that we review de novo.[6]

### B. The Adjudication Hearing

■ At the December adjudication hearing the superior court found that V.D. had neglected her children by leaving them with the Larsons and that they were therefore children in need of aid under former AS 47.10.010(a)(6).[7] Because the parties focused on whether the children needed aid when the state took custody in April, the court based its adjudication order on the children's status at that time. It heard almost no evidence concerning their need for assistance—or

V.D.'s ability to provide for them—at the time of the adjudication hearing.

In our view, this approach is problematic. When the state takes protective custody of a child and files a petition for adjudication, it asserts that adjudication is necessary because the child needs state assistance. It follows that the relevant question at adjudication should be whether the child is presently at risk, not whether a risk existed some months earlier.

The present-tense wording of our CINA adjudication statutes supports this proposition. For example, former AS 47.10.010(a)—which applies to this case—provides for adjudication "when the court finds the minor *to be* a child in need of aid."[8] Likewise, former AS 47.10.080 directs the court, upon concluding an adjudication hearing, to "enter a judgment that the child *is or is not* a child in need of aid."[9] This statutory language plainly calls for the court to base its adjudication orders upon proof of a present need for state intervention.

Our case law reinforces this plain meaning. In *D.H. v. State, Department of Health and Social Services*, for example, we upheld a CINA adjudication based on proof that a child's mother had neglected her between the time the state took custody and the adjudication hearing months later.[10] Moreover, in *In re J.A.* we stated in the setting of a temporary custody hearing that the trial court must consider the totality of the circumstances—not just the isolated event that resulted in emergency custody—to determine "whether, *at the time of the hearing*, probable cause exists to believe that the child is a

---

4. The court entered a formal written order confirming its December 1997 adjudication ruling on March 6, 1998.

5. *See R.J.M. v. State, Dep't of Health & Social Servs.*, 973 P.2d 79, 84 (Alaska 1999).

6. *See E.M. v. State, Dep't of Health & Social Servs.*, 959 P.2d 766, 768 (Alaska 1998).

7. Former AS 47.10.010(a)(6) (1996), which applies to this case, provides for entry of a CINA adjudication "when the court finds the minor to be a child in need of aid as a result of ... the child having suffered substantial physical abuse or neglect as a result of conditions created by the child's parent, guardian, or custodian."

8. Former AS 47.10.010(a) (1996) (emphasis added).

9. Former AS 47.10.080(a) (1996) (emphasis added). The focus on present conditions is equally explicit in the section authorizing courts to enter a termination order "upon a showing in the adjudication by clear and convincing evidence that *there is* a child in need of aid." Former AS 47.10.080(c)(3) (1996) (emphasis added).

10. *See D.H. v. State, Dep't of Health & Social Servs.*, 929 P.2d 650, 652–54 (Alaska 1996).

child in need of aid." [11] These holdings imply that the relevant inquiry at adjudication is whether the child is then in need of aid as a result of conduct alleged in the petition.

Our recent decision in *O.R. v. State, Department of Health and Social Services* adds specific guidance for cases like V.D.'s, where the CINA adjudication is based on physical neglect.[12] We held in *O.R.* that to establish CINA status based on physical neglect under former AS 47.10.010(a)(6), the state need not prove that a child has actually suffered substantial physical harm.[13] Noting that neglect occurs when a parent's failure to act places a child at risk of substantial physical harm, we stated that "the emphasis of the [CINA] inquiry is on the possibility of harm to the child due to neglectful parental conduct, not on the harm itself." [14] We further emphasized that adjudication under subsection (6) will be warranted when "parental conduct causing the potential for harm suffices to trigger state action." [15]

■ In the present case, the court focused on the situation as of April 1997, when the state took custody, and determined that the resulting risk of harm sufficed to trigger state intervention. But the court did not ask or answer the critical question whether V.D.'s children remained at risk of serious harm based on the emergency situation eight months before. And our review of the record establishes that the state failed to prove that V.D. posed any appreciable risk to her children at the time of adjudication.[16]

Comments made at the hearing by counsel and the trial court suggest that V.D. was unprepared to resume immediate custody of her children. But V.D.'s problems with immediate custody were largely due to her separation from her children during the months preceding adjudication. During that time, the state had requested a home study in Florida as required under the Interstate Compact on the Placement of Children.[17] Florida would not agree to accept the transfer until V.D. secured a larger house, obtained a car, and underwent substance abuse and psychological evaluation and treatment. Furthermore, once the state had assumed custody of her children, V.D. ceased receiving social security benefits on their behalf.

These problems posed no insurmountable obstacle to a prompt reunification. The conditions imposed by Florida applied only in the event of an interstate transfer while the children remained wards of the state.[18] And V.D.'s precarious financial condition would have been resolved by the return of her children; the children's social security payments would have almost doubled her monthly income of $900. In any event, her indigence could not itself justify a denial of custody.[19]

In short, while the state presented evidence indicating that the children were in need of aid eight months earlier, it did not prove that they were children in need of aid at the time of adjudication. Since the state failed to establish a present potential for harm sufficient to warrant its continued intervention, we hold that the superior court

11.  962 P.2d 173, 176 (Alaska 1998) (emphasis added).

12.  *See O.R. v. State, Dep't of Health & Social Servs.*, 968 P.2d 93 (Alaska 1998).

13.  *Id.* at 98.

14.  *Id.*

15.  *Id.*

16.  Frye testified that he had heard allegations that V.D. had a drinking problem, but he conceded that V.D.'s inability to provide care, not her substance abuse, was the primary basis for taking custody and petitioning for CINA adjudication. V.D. had acknowledged having a drink-

ing problem, though she claimed she did not neglect her children as a result. The state did not seek to establish the nature and extent of V.D.'s problem, and presented no evidence indicating that her substance abuse had ever interfered with her parenting. Indeed, a DFYS investigation of V.D.'s home shortly before she left for Florida had found no child protection concerns. Moreover, in entering its adjudication order, the trial court gave no indication that it had considered this issue to be significant.

17.  AS 47.70.010.

18.  *See id.*

19.  *See In re S.A.*, 912 P.2d 1235, 1239 (Alaska 1996); *F.T. v. State*, 862 P.2d 857, 861 (Alaska 1993).

erred in concluding that V.D.'s children were children in need of aid.

### C. *Right to Counsel*

■ Although V.D. requested an attorney at the temporary custody hearing in April 1997, the trial court failed to appoint counsel until June 27. In the interim, apart from sending V.D. an application form, the court took no active measures to ensure that her request for appointed counsel would be honored. Indeed, when the court failed to receive V.D.'s application in time for the May 23 hearing, it simply canceled the hearing and postponed the case until late June. V.D. contends that the court's inaction deprived her of her right to counsel.

CINA Rule 10(b)(2), which governs temporary custody proceedings, provides that "[t]he court shall advise the parties of their right to counsel, including the right to court-appointed counsel if applicable." The Indian Child Welfare Act (ICWA) similarly requires court-appointed counsel in any removal proceeding in which the court determines that a parent is indigent.[20] Neither provision requires immediate judicial action upon a request for court appointment. Thus, by advising V.D. of her right to counsel and mailing her an application form, the trial court complied with the letter of these requirements.

But the trial court's minimal response to V.D.'s request for counsel is nonetheless disturbing. The circumstances that enmeshed V.D. and her children at the time of the April hearing on emergency custody made it obvious that V.D. was impoverished and would likely qualify for appointed counsel. These same circumstances suggested an urgent need for representation to explore the feasibility of prompt reunification. By allowing a lengthy delay before appointing counsel, the court effectively deprived V.D. of the opportunity to request a timely, adversarial review of its probable cause and temporary placement decisions.[21] This delay also worked against ICWA's fundamental goal of promoting stability and security in Indian families.[22]

And more pragmatically, V.D.'s inability to secure prompt representation prevented her from exploring practical solutions that might have avoided protracted, costly, and potentially destructive CINA litigation.

■ As we have already observed, the CINA rules and ICWA did not clearly require an earlier order appointing counsel. But neither did they preclude the trial court from exercising its broad discretion by appointing counsel immediately or, at a minimum, by taking more active steps to ensure a timely appointment. We urge courts in the future to recognize the crucial difference that an early appointment of counsel can make in such cases and to remain sensitive to the potentially drastic consequences of unnecessary delay.

### D. *Active Efforts*

V.D. separately claims that the trial court erred in finding that DFYS made active and reasonable efforts to provide remedial and rehabilitative services to prevent the breakup of her Indian family. Because we have concluded that the error in finding the children in need of aid requires reversal, we need not address this claim.

### IV. *CONCLUSION*

We REVERSE the superior court's finding that V.D.'s children were children in need of aid.

---

**20.** *See* 25 U.S.C. § 1912(b) (1994).

**21.** *See* CINA Rule 10(e) (providing for review pending adjudication).

**22.** *See* 25 C.F.R. § 23.3 (1999).