995 P.2d 205 (2000)
D.M., Appellant,
v.
STATE of Alaska, DIVISION OF FAMILY AND YOUTH SERVICES, Appellee.
No. S-8294.
Supreme Court of Alaska.
January 14, 2000.
*206 G. Blair McCune, Deputy Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.
Richard P. Sullivan, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.
Erica Kracker, Kracker Law Office, Palmer, Guardian ad Litem.
Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

OPINION
EASTAUGH, Justice.

I. INTRODUCTION

The superior court terminated a mother's parental rights in 1997. In doing so, it relied on findings it had made in 1995, when it adjudicated the mother's children to be in need of aid. It had made those adjudication findings under the clear and convincing evidence standard, rather than the usual preponderance standard, at the state's request. Did the superior court's reliance on the those findings violate the mother's due process rights, where the state gave no advance notice of its request until the beginning of the adjudication hearing? Despite the lack of advance notice, we reject the mother's claim that her due process rights were violated. Because her other challenges to the termination decision also lack merit, we affirm.

II. FACTS AND PROCEEDINGS

This appeal arises from the termination of D.M.'s parental rights to her four of five *207 minor children.[1] The family's history is lengthy and complex, but the salient facts may be stated briefly.
D.M. has been in a series of abusive relationships. She was diagnosed as suffering from aspects of personality disorders and post-traumatic stress disorder. At various times, her children have been subjected to physical abuse from their father, S.M., and their older sibling, R.B. All of the five youngest children are extremely and severely emotionally damaged.
D.M. and her children moved to an Alaska community in 1985. In the following years, D.M.'s troubled family received various community services. The Alaska Division of Family and Youth Services (DFYS) became formally involved with D.M.'s family in July 1994 when it sought an order to investigate and a writ of assistance. Following its investigation, DFYS filed a petition to adjudicate the children "children in need of aid" (CINA). After a period of supervision, DFYS filed an amended petition for adjudication of CINA status in November 1994.
The superior court held the adjudication hearing in September 1995. At the outset of the hearing, the state asked the court to make adjudication findings under the clear and convincing evidence standard. The state explained that this evidentiary standard must be met to justify termination. It had not previously given notice of its intention to seek findings under this evidentiary standard. D.M. objected, arguing that she was prepared to defend against an adjudication, not a termination. The superior court overruled D.M.'s objection, noting that going forward under a higher standard of proof did not convert the adjudication hearing into a termination proceeding. The court also stated that, because the state's request would require it to go forward under a more onerous standard of proof, D.M. would not be prejudiced. Following the hearing, the court issued a written order, finding by clear and convincing evidence that D.M.'s children were in need of aid. The court listed five statutory jurisdictional grounds for that finding.
DFYS filed a petition for termination on December 1, 1995. After briefing, the superior court decided that it could rely for purposes of its termination determination on the clear and convincing findings it had made at the adjudication hearing. The court held a termination hearing in June 1997, about eighteen months after issuing its adjudication findings. It heard additional evidence and the arguments of the parties' counsel; it then entered an order terminating D.M.'s parental rights.[2] The pertinent parts of the termination order are set out in Appendix A.
D.M. appeals.

III. DISCUSSION

A. Standard of Review

Whether there was a violation of D.M.'s right to due process is a question of law.[3] Whether the superior court's findings comport with the requirements of the CINA statutes and rules then in effect is also a question of law.[4] We review questions of law de novo, adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[5]
We review the factual findings underlying the superior court's termination decision for clear error, reversing only if our review of the record leaves us with the definite *208 and firm conviction that the superior court has made a mistake.[6]

B. The Superior Court Did Not Violate the CINA Rules by Making Adjudication Findings under the Clear and Convincing Standard or by Relying on those Findings at the Termination Stage.

D.M. argues that Child in Need of Aid (CINA) Rule 18(a)[7] did not permit the superior court to rely upon its adjudication findings to establish her children's CINA status for purposes of termination.[8] She contends that the rule required the court to hold a trial de novo on the children's CINA status in conjunction with the termination proceedings. We disagree because we do not read the CINA rules to have prohibited the court at the termination hearing from relying on its adjudication findings. To see why, and to set the stage for the constitutional issue discussed in Part III.C, we first discuss the pertinent rules and procedure.
The CINA rules then in effect required the state to do two things if it sought to terminate parental rights: (1) it had to petition for an adjudication that the minor was a child in need of aid, and (2) it had to petition for entry of an order terminating parental rights.[9] As a matter of practice, the state often filed a termination petition only after the courthaving conducted the adjudication hearinghad granted the adjudication petition. The rules also permitted the state to file a termination petition "combined with" the adjudication petition.[10] The rules also permitted the superior court, "[u]pon a showing of good cause and with adequate notice to the parties," to consolidate the adjudication hearing and the termination hearing.[11] Whether it considered the petitions in separate or in consolidated hearings, the court could not terminate parental rights before it found the child to be in need of aid. Nothing in our rules prohibited it from granting both petitions simultaneously in a single document following a consolidated hearing, but if the court followed that course, analytically it had to first find the minor to be in need of aid before it could terminate parental rights.
The CINA rules specified different standards of proof for the adjudication and termination hearings. At the adjudication hearing, the state was required to prove child-in-need-of-aid status by a preponderance of the evidence.[12] At the termination proceeding, the state had to satisfy the clear and convincing standard.[13]
In addition to the applicable proof standard, the prerequisites for granting the two petitions differ in other respects. Adjudicating CINA status required a finding that the child was in need of aid at the time of the adjudication hearing.[14] It therefore turned *209 on a determination of the child's then-current status.[15]
In comparison, aside from termination for reasons not germane here,[16] termination required two main findings. First, it required a finding that the state "proved by clear and convincing evidence at the adjudication hearing that the child is a child in need of aid as a result of conduct of the parent."[17] Second, it required a finding that "the parental conduct that caused the minor to be adjudicated a child in need of aid is likely to continue unless parental rights are terminated."[18] Therefore, termination ultimately turned on a prediction of a continuation of the parental conduct that resulted in the CINA adjudication. The fundamental factual focus at the termination stage was therefore different. Relevant to that inquiry was all evidence of the parent's pre-termination hearing conduct, including evidence of parental conduct predating the CINA adjudication, that might shed light on the likelihood the adverse conduct would continue unless parental rights were terminated.
Nothing in the rule prevented a parent at the termination stage from offering all relevant evidence about parental conduct, both to challenge misperceptions about pre-adjudication conduct and to challenge a state assertion that the conduct would continue. Thus, in 1997 all evidence of D.M.'s pre-termination hearing conduct, including her pre-adjudication conduct and her conduct between 1995 and 1997, would have been relevant to predicting her future conduct. The adjudication findings, regardless of the proof standard, could not foreclose a parent at the termination proceeding from (1) requiring the court to consider the evidence offered at the adjudication hearing, (2) offering new evidence about the parent's conduct at any relevant time, and (3) even recalling adjudication-stage witnesses to offer evidence not previously received or possibly even to impeach their prior testimony for newly revealed reasons. Therefore, nothing resolved at the adjudication stage foreclosed a parent from fully litigating all relevant issues at the termination stage.
We hold that nothing in the CINA rules or inherent in the adjudication-termination process precluded the state from seeking a finding of CINA status under the clear and convincing standard at an adjudication hearing. We therefore hold that the court at the adjudication hearing in this case could apply the clear and convincing standard in finding CINA status.
We also hold that because the adjudication findings on the children's CINA status were made under the clear and convincing standard, the court at the termination hearing could rely on them. The court was not required to make new findings in 1997 on the issue of the minors' CINA status as of 1995. But likewise, nothing prevented D.M. from fully litigating all relevant termination issues in 1997.
The propriety of relying at the termination hearing on the earlier findings is confirmed by considering the alternative: at the termination proceeding, a court could review the evidence offered at the adjudication hearing, and, applying the stricter proof standard, make supplemental findings satisfying the requirements for termination. Absent new evidence impeaching or supplementing the earlier evidence, that alternative would not be superior to relying on adjudication-stage findings made under the stricter standard while the evidence was still fresh.
Relying on the earlier findings could not resolve all issues pertinent to termination. The state was still obliged to prove that the parental conduct would continue absent termination.[19] It was also required to demonstrate that the conduct that would continue *210 was the conduct that resulted in CINA status. Those termination issues normally required evidence concerning post-adjudication hearing parental conduct.[20] Consequently, whatever the evidentiary standard, the adjudication findings could not resolve those issues.
Appendix A contains the pertinent parts of the superior court's termination order in this case. It demonstrates that the superior court thoroughly considered the critical issues and made the necessary findings.

C. The Superior Court Did Not Violate D.M.'s Due Process Rights.

D.M. argues that the court violated her right to due process because she did not have advance notice that the state would ask the court to make adjudication findings under the clear and convincing standard. Before we consider D.M.'s due process argument, we consider whether the lack of advance notice violated the CINA rules.

1. Notice and the CINA Rules

The CINA rules do not expressly address the notice issue. CINA Rule 18(a) required that a termination petition be served, and CINA Rule 18(b) required that the parties have "adequate notice" before the court could consolidate the adjudication and termination hearings.
The state had not yet filed a termination petition when it asked the superior court, at the beginning of the adjudication hearing, to make adjudication findings under the clear and convincing evidence standard. The state apparently gave D.M. no prior notice of its intention to request findings by that standard. And it apparently gave D.M. no formal advance notice that it intended to seek termination.[21] Although the CINA rules did not expressly make the state's findings request untimely, its timing arguably violated the spirit of the rules because it permitted the state to litigate facts relevant to termination (parental conduct resulting in the CINA adjudication) at the adjudication hearing with no formal prior notice that any aspect of termination, as distinct from adjudication, was potentially in issue. We do not condone the timing of the state's request.
But we see no basis for concluding that the untimeliness of the state's request harmed D.M. First, at the termination hearing in 1997, the court could have followed the alternative discussed above: applying the stricter standard, it could have reviewed the evidence offered at the 1995 adjudication hearing and made supplemental findings about the parents' pre-hearing conduct. There is no reason to think the court's findings on that issue, based on the same evidence, in 1997 would have differed from its findings in 1995.
Second, D.M. has advanced no plausible basis for finding that she was actually prejudiced. She claims that if she had been aware of the state's intention, more experienced counsel would have been assigned to represent her at the adjudication hearing, that different witnesses might have been called, and that her trial preparation might have been different. And she argues, as does the dissent, that she was prevented from making a record about precisely how she was prejudiced. But nothing prevented her from making an offer of proof on the issue in the superior court, and nothing prevents her on appeal from explaining how the outcome actually might have been affected or demonstrating that there was any genuine dispute about the material facts. And, as she concedes, parties in criminal and CINA proceedings have no right to "pick and choose among *211 appointed counsel."[22]
The record shows that D.M. appeared through appointed counsel (the Public Defender Agency) at the adjudication hearing and vigorously litigated her position. D.M. called nineteen witnesses in her defense at the adjudication hearing to dispute the issue of the children's status. There is no indication she did not take the adjudication hearing seriously or that she made a tactical choice to save her evidence and litigation efforts for any future termination hearing, or made an unwise tactical choice by disputing the CINA status issue. D.M. does not even theorize how the assignment of more experienced counsel actually might have affected the outcome of the case, i.e., potentially altered the findings about D.M.'s parental conduct. The length of the hearing gave D.M.'s attorney ample opportunity, if she wished, to consult with other lawyers at the Public Defender Agency and to locate any additional witnesses or other evidence that she thought the state's request might have justified. She did not request a continuance and never later argued that her attorney should have asked for one. She did not claim that she was unable to offer favorable evidence or call favorable witnesses, and she does not make that claim now. She did not argue then, and does not argue now, that her examination of the state's witnesses actually suffered.
The record affirmatively indicates that the lack of notice did not harm D.M. Before the termination hearing began, the superior court, at the state's request, appointed independent counsel to advise D.M. as to whether she should file a motion to assert that she had been given ineffective assistance by the attorney who had represented her at the adjudication hearing. Such a motion would have given D.M. the opportunity to explain, through argument and evidence, how lack of notice prejudiced her. But D.M., having consulted independent counsel, did not file such a motion. Nor did she otherwise present argument or adduce facts that permit an inference of actual prejudice. D.M.'s failure to file such a motion or explain what she would have done differently through different counsel tends to confirm the validity of the superior court's statements praising the quality of her representation at the adjudication stage:
[I]t's my finding, after again participating in the two-week proceeding that we had, that the mother vigorously contested all the evidence that could possibly support either adjudication or termination issues, and it doesn't seem to me that her motives to respond to the evidence and produce evidence of her own would have been any different if it were in fact true that she didn't realize that the state was asking for a clear and convincing finding as well a preponderance of evidence finding on the things that supported adjudication and termination.
It seems abundantly clear to me that she was aware. But, even if, for some reason, she really weren't aware, it's abundantly clear that she fought everything, and was defended vigorously and competently, and therefore the outcome wouldn't be any different, and there really wouldn't be any prejudice is what the court is saying.
Moreover, D.M. did not ask the superior court to reopen the issue of the children's 1995 CINA status or make different findings about D.M.'s pre-adjudication hearing conduct, although that would have been a logical thing to do if there were additional or late-discovered evidence that might have supported a different finding concerning the children's status in 1995.
Third, the application of the higher standard of proof did not change the sole issue (the children's CINA status at that time) to be litigated at the 1995 adjudication hearing; rather, it only increased the state's burden. And the state still had to prove by clear and convincing evidence at the termination hearing in 1997 that (1) the parental conduct that caused the children to be adjudicated children in need of aid in 1995 "is likely to continue" unless parental rights were terminated, and (2) the predicted parental conduct as of 1997 was the same as the conduct that *212 caused the children to be adjudicated children in need of aid in 1995.[23] We therefore conclude that there is no indication D.M.'s case actually suffered as a result of any failure to give earlier notice.

2. Notice and due process

We next consider D.M.'s procedural due process argument. When determining the requirements of due process, we look to the test enunciated by the United States Supreme Court in Mathews v. Eldridge:[24]
[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[25]
The Mathews factors generally weigh in favor of requiring notice in a proceeding to terminate parental rights. The private interest affected is of great importance; parental rights are "of the highest order."[26] Lack of notice theoretically could cause an erroneous termination of rights that notice would have prevented. And the government's interest in not giving advance notice is small; notice requirements impose little fiscal or administrative burden upon government agencies.
But this general assessment is insufficient to decide whether D.M. was denied due process. Not every potential deprivation of protected interests results in a due process violation. Because there is no dispute here about the other prongs, it is necessary to focus on the second prong of the Mathews test: "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."[27]
We recognize that a failure to give advance notice of a request for CINA status findings under the clear and convincing standard of proof at the adjudication hearing could theoretically affect parental rights at a subsequent termination proceeding. Parents might not realize the importance of the adjudication hearing and might appear at that hearing unprepared to litigate CINA status adequately. Or they might make tactical litigation choices, as the dissent suggests, that prove to be prejudicial.[28]
But a theoretical possibility of prejudice is not enough; to decide under Mathews whether due process was denied, a court must assess "the probable value" of timely notice in reducing the risk that parental rights might be erroneously terminated. Thus, a court must consider the likelihood that proper notice might alter the outcome. In answering that question, we must assess the ways which D.M. here claims she might have been prejudiced. This is not the same as determining whether any constitutional error was harmless, but more fundamentally considers whether lack of notice might deprive a parent of sufficient opportunity to prepare her case.[29] In deciding whether it *213 might, we consider the issues presented in a termination proceeding, and a parent's ability to protect her interests at the adjudication and termination proceedings.
First, the substantive issue at the adjudication hearingthe children's CINA statusis unchanged by applying a stricter proof standard.
Second, an adjudication hearing is an important proceeding, and although lack of notice might lull some parents into complacency, there was absolutely no reason to think that D.M. was not prepared to litigate vigorously at the adjudication hearing. Her pre-hearing witness list reflected that she was prepared to defend her position.
Third, an extended adjudication hearing, as this one was, provides ample opportunity to remedy any theoretical prejudice. Conceding CINA status, for example, would remedy any theoretical prejudice arising from the tactical choice of litigating CINA status at the adjudication hearing. Requesting a continuance would remedy a lack of preparation or loss of critical evidence.
Fourth, proper notice would not alter the issues to be litigated at the termination stage, or affect parents' ability to offer evidence about the nature and consequences of the conduct relevant to termination issues. The state still had to establish at the termination stage, to a clear and convincing standard, that the conduct at issue was likely to continue. Parents retained the right to introduce new or additional evidence at the termination hearing bearing on whether their conduct had changed for the better; they could even recall the same witnesses to expand or impeach their testimony. Any relevant lack of preparation at the adjudication stage could be remedied through a vigorous defense at the termination hearing.
Fifth, the state could have accomplished the same thing by asking the court at the 1997 termination hearing to consider the evidence at the 1995 adjudication hearing in making findings under the clear and convincing standard to satisfy CINA Rules 15(c) and 18(c)(1).
We therefore conclude that the "probable value" of proper notice was small and that late notice created little risk of erroneous termination of D.M.'s rights.
Our theoretical analysis of the second Mathews prong is confirmed by our review of the record, and by D.M.'s failure to identify any plausible way that she was prejudiced in the termination proceedings. This inquiry imposes no duty on her to prove prejudice, beyond every appellant's adversarial duty to identify valid grounds for finding a denial of due process.
Thus, as noted above, D.M. litigated the status issue vigorously and competently.[30] She had ample opportunity to protect her interests. She could have asked to call additional witnesses not listed or offer exhibits not previously disclosed. She could have asked for a continuance before hearing any evidence or to allow more preparation. Our review of the record leaves us with no impression that D.M.'s adjudication stage attorney was underprepared; she had represented D.M. at least since February 1995.
We also decline to hold that the assumed deprivation of more experienced counsel denied D.M. due process. We have no reason to think that more experienced counsel at the adjudication stage could have done anything to alter the outcome at the termination stage. It is always possible to argue that a more capable attorney might have affected the outcome. But that is not the relevant inquiry. The proper question is whether counsel was ineffective. In this case, independent counsel reviewed the proceedings and D.M. chose not to assert a claim of ineffective assistance.
A parent might protest, as D.M. does, that she did not come to the hearing "prepared to defend on a termination of parental rights." But assuming an attorney's lack of preparation were relevant to the notice issue, this objection overstates the impact of the practice followed here.
"The crux of due process is opportunity to be heard and the right to adequately *214 represent one's interests."[31] The provision of adequate notice commonly guarantees these rights.[32] But even if notice is inadequate, "the opportunity to be heard can still be preserved and protected if a party actually appears and presents his claim."[33]
Applying the Mathews analysis, we therefore conclude that D.M.'s rights were not violated here.
We do not condone the practice the state followed here. In many cases, late or inadequate notice may require a conclusion that the parent was denied due process. If so, the error will require either an outright reversal of the termination decision or a remand to determine whether the error was harmless. The inevitable result will be a great delay in ultimately resolving the dispute on the merits. But that is not the case here.

D. The Superior Court Did Not Clearly Err in Finding that D.M.'s Conduct Was Likely to Continue.

D.M. further claims that the superior court erred in finding clear and convincing evidence that D.M.'s conduct which caused the children to be adjudicated children in need of aid was likely to continue. She argues that the court ignored evidence of her efforts to remedy her mental health and other problems. In doing so, she emphasizes portions of the hearing record which support her own view of the evidence.
The state defends the superior court's findings, citing testimony and evidence presented at the termination hearing. The court found that the children were likely to suffer substantial neglect and to remain at imminent and substantial risk of suffering substantial physical harm and sexual abuse if it did not terminate D.M.'s parental rights. In addition, the court noted:
That the evidence is clear and convincing that [D.M.] has been and continues to be unable to change her basic parenting behavior. That this behavior has been and continues to be highly detrimental to the children['s] welfare. Based on the opinions of Dr. Rose and Dr. Holiday, the court believes that the evidence is clear and convincing in establishing that the mother's conduct is likely to continue.
The applicable standard of reviewclear errordisposes of this issue. The record amply supports the superior court's express findings. The superior court considered the evidence D.M. cited, but determined that other evidence in the record outweighed it. We will not reweigh the evidence when the record provides clear support for the trial court's ruling.[34] We therefore find no error in the superior court's finding that D.M.'s conduct was likely to continue.

E. The Superior Court Did Not Err by Applying a Preponderance of the Evidence Standard in Making Particular Findings at the Termination Hearing.

D.M. contends that the superior court applied the incorrect standard of proofpreponderance of the evidencewhen it made factual findings at the termination hearing. She claims the standard of proof at termination hearings is the clear and convincing evidence standard.
D.M. misinterprets the requirements of former CINA Rule 18(c)(1) and the superior court's actions. Former CINA Rule 18(c)(1) specifies that the state "must prove by clear and convincing evidence that ... the parental conduct that caused the minor to be adjudicated *215 a child in need of aid is likely to continue unless parental rights are terminated." Although the superior court made particular factual findings by a preponderance of the evidence, it stated that it found by clear and convincing evidence that the evidence taken as a whole demonstrated that D.M.'s conduct was likely to continue.
Unless otherwise specified, the standard of proof in civil proceedings is by a preponderance of the evidence. In this termination proceeding, CINA Rule 18(c)(1) imposed a higher standard of proof only with respect to the question of whether the parental conduct that caused the children to be adjudicated children in need of aid was likely to continue. The superior court found that the state met this burden.

IV. CONCLUSION

For these reasons, we AFFIRM the superior court's termination of D.M.'s parental rights.
BRYNER, Justice, with whom FABE, Justice, joins, dissenting.

I. INTRODUCTION

The court today concludes that D.M. had no constitutional right to advance notice of the state's intent to use her children's CINA adjudication hearing as a springboard for termination of her parental rights; and to the extent that a right to prior notice existed on a sub-constitutional plane, the court holds that its violation was harmless. I disagree. Under the facts of this case, due process required the state to give D.M. advance notice of its decision to use the adjudication hearing as the first step toward termination. The state failed to give her adequate notice, and I believe that it now has the burden of showing that this constitutional error is harmless. Because it has not had the opportunity to meet this burden, I would remand for a hearing on harmless error.

II. DISCUSSION

A. Due Process

The court observes that termination is a form of disposition rather than a separate class of adjudication and, thus, that "[n]othing in the CINA rules or inherent in the adjudication-termination process precluded the state from seeking a finding of CINA status under the clear and convincing standard at an adjudication hearing."[1] I do not dispute this observation. But by itself it resolves very little.
Before the superior court enters an order terminating parental rights, it must find that the state proved the child's CINA status by clear and convincing evidence.[2] But a lower burden applies to all other CINA adjudication orders: when parental rights are not at stake, the superior court need only base its adjudication order on a preponderance of the evidence.[3] Thus, unless termination has been properly placed in issue as a potential disposition, an adjudication order finding CINA status by clear and convincing evidence is unnecessary to the extent that it exceeds the requisite standard of proof preponderance of the evidence. And to the extent that the order incorporates a determination not essential to the judgment, it does not bar further litigation of CINA status if a subsequent petition for termination calls for a CINA adjudication based on clear and convincing evidence.[4]
Thus, unless the state properly placed termination at issue at the adjudication hearing, the superior court's original adjudicative findings could not have barred D.M. from requiring the court to redetermine the issue of CINA status, applying the more stringent standard of proof, after the state filed its termination petition. The critical question, then, is not whether the CINA rules allow the state to obtain an adjudication order *216 based on clear and convincing evidence before it petitions for termination; rather, it is whether the manner in which the state did so here was procedurally proper. More specifically, the question is whether the state was required to give D.M. formal notice before the adjudication hearing that it intended to place termination at issue.
The court acknowledges this question, yet hedges on its answer: while it declines to "condone the timing of the state's request" for findings by clear and convincing evidence, it rules only that the timing of the state's request "arguably violated the spirit of the rules because it permitted the state to litigate facts relevant to termination (parental conduct resulting in the CINA adjudication) at the adjudication hearing with no formal prior notice that any aspect of termination, as distinct from adjudication, was potentially in issue."[5] But D.M.'s case squarely raises this question, and I believe that it requires a direct answer.
It might be argued, of course, that the state's petition for adjudication did give D.M. formal notice that termination might be at issue during the adjudication hearing. Upon entering a CINA adjudication order, the trial court ordinarily has three dispositional options: it may order the child released, with or without state supervision, to parents or other guardians; it may order the child committed to state custody for a period of up to two years; or, under specified conditions, it may enter an order terminating parental rights and commit the child to state custody for permanent placement.[6] Because Alaska's CINA rules do not require a petition for adjudication to request any specific disposition, all of these dispositions are arguably at issue if the petition for adjudication does not expressly exclude a particular disposition.
In theory, then, when the state files a petition for adjudication that leaves all dispositional options open, it gives constructive notice to parents that termination will be at issue at the adjudication hearingthat if the hearing ends in an order adjudicating their child a CINA, termination will be one possible consequence.
But this constructive notice theory fails to reflect procedural reality. Alaska case law reveals no prior instance in which the state has actually resorted to the curious procedure that it followed herethat is, no case in which it has: (1) petitioned for CINA adjudication without declaring its intent to seek termination; (2) obtained an initial CINA adjudication based on clear and convincing evidence; and (3) petitioned to terminate parental rights while the child awaited the initial disposition on the CINA adjudication. Moreover, the state cites no prior trial court cases in which it has followed this procedure. Thus, although Alaska's CINA rules do not specifically forbid it, the procedure used in this case appears to be novel. In reality, then, the mere filing of the adjudication petition would not have given D.M. or her counsel fair warning that termination would actually be at stake during the adjudication hearing.[7]
Moreover, in this case the state's petition for adjudication specifically asked the court "[f]or a final adjudication and disposition committing the minors [D.M.'s children] to the legal custody of the Department of Health and Social Services for a period not to exceed two years." By expressly requesting only one of three permissible dispositions and failing to mention the others, including termination, the state implicitly represented that it would not directly seek termination in the event of a CINA adjudication. Yet the state suddenly shifted course at the outset of the adjudication hearing, asking the trial court to make findings by clear and convincing evidence. By adding termination as a newly proposed disposition, the state effectively obtained *217 a last-minute amendment of its petition.
I would hold that this bait-and-switch procedure violated D.M.'s right to procedural due process because it left her with virtually no advance notice of a significant matter at issue at the adjudication hearing. The due process standard articulated in Mathews v. Eldridge considers three factors: (1) the private interest affected by the challenged procedure; (2) the risk that the procedure will erroneously deprive the claimant of this interest and the probable value of additional or substitute safeguards; and (3) the state's interest in following the challenged procedure and in avoiding burdens that might result from adopting additional or substitute safeguards.[8] Each factor favors D.M.
First, the private interest affected by the state's unannounced change in strategyD.M.'s fundamental right to maintain her maternal ties to her childrenwas one of paramount importance: "one of the most basic of all civil liberties, the right to direct the upbringing of one's child."[9]
Second, the state's last-minute shift in strategy created a significant risk that D.M. might be erroneously deprived of her parental rights. By adding termination to the mix without any advance warning, the state suddenly upped the stakes at the adjudication hearing and obviously caught D.M. unprepared. The current record convincingly indicates that, at the very least, D.M. would have had the benefit of more experienced counsel had she received adequate notice. This is a benefit of incalculable value. Moreover, as I explain in greater detail below when I discuss harmless error, it is quite possible that D.M. suffered additional prejudice.
Third, the state has no discernible interest in the bizarre and evidently unprecedented procedural course that it took in this case. The state fails to explain why its petition for adjudication expressly omitted termination as a proposed disposition; and it offers no justification, in light of this omission, for its precipitous request to add termination back as a proposed disposition.
This court has willingly granted relief to aggrieved litigants in cases with analogous procedural errors. For example, in Cushing v. Painter we found that the trial court violated a parent's right to due process by entering a permanent child custody order after conducting a hearing that had been scheduled to determine interim custody.[10] In concluding that "the proceeding ... did not afford basic fairness to the appellant," we focused on the truncated nature of the interim hearing and the limited time that the parties were given to prepare.[11] In the present case, the concerns are somewhat different than they were in Cushing. D.M. faced no comparable restrictions on the time allotted for her hearing or on the number of allowable witnesses. But the consequences of the procedural error in this case were potentially as deleterious as those occurring in Cushing. Here, the state's last-minute request for clear and convincing evidence findings deprived D.M. of time to prepare an adjudication defense tailored to avoid termination and left her represented by an attorney who had never before defended a termination action and who would not ordinarily have been assigned to such a case.[12]
*218 Donlun v. State provides another useful analogy.[13] Donlun was indicted for and convicted of burglary in a dwelling under a statute that provided enhanced penalties for nighttime burglaries and burglaries of occupied dwellings.[14] Since the undisputed facts established that Donlun committed the offense at night in an occupied dwelling, the sentencing court based its sentence on the premise that the enhanced sentencing range applied.[15] We reversed, concluding that the enhanced sentencing provisions could not be applied because Donlun had not been given prior notice of the aggravating circumstances:
The particular range of sentences to be applied in any given situation thus depends not upon the discretion of the sentencing court but rather upon the existence of particular aggravating facts set forth in the statute. We believe that if a defendant is to be given a fair opportunity to defend against a burglary charge involving aggravated circumstances, such circumstances must be set forth in the indictment, information, or complaint and proven at trial.[16]
Here, as in Donlun, a statute created an aggravated form of dispositiontermination of parental rights. The statute also demanded certain enhanced showings, including proof of CINA status by clear and convincing evidence, before the court could impose that particular disposition. Thus, under Donlun, D.M. was entitled to clear, formal notice of the showings to be made at the adjudication hearing.
In refusing to acknowledge a due process violation, the court narrowly focuses on "the ways which D.M. here claims she might have been prejudiced."[17] Finding no obvious potential for prejudice on the facts of this case, the court preliminarily concludes "that the `probable value' of proper notice was small and that late notice created little risk of erroneous termination of D.M.'s rights."[18] The court then proceeds to confirm that D.M. suffered no actual prejudice, ultimately concluding:
We do not condone the practice the state followed here. In many cases, late or inadequate notice may require a conclusion that the parent was denied due process. If so, the error will require either an outright reversal of the termination decision or a remand to determine whether the error was harmless. The inevitable result will be a great delay in ultimately resolving the dispute on the merits. But that is not the case here.[19]
But while this approach looks at both the theory and fact of D.M.'s claim of prejudice, it effectively conflates procedural due process and harmless error analysis. The United States Supreme Court in Mathews emphasized that due process is not a static concept.[20] It thus fashioned a flexible due process standard that examines procedural fairness in the context of the particular case at issue.[21] Following Mathews lead, we have at times eschewed "abstract" due process analysis, stressing that "our primary focus is on what happened ... not what might happen."[22]
Yet Mathews's flexible rule of contextual fairness cannot justify collapsing due process analysis into a harmless error inquirythat is, into an outcome-based search for actual prejudice. Were we to view procedural due process as a mere test of harmless error, virtually any procedural error, no matter how fundamental, could be excused by an *219 after-the-fact review establishing that the process ultimately yielded a fair result. Applying the Mathews test in this manner, we might justify even the most extreme and outrageous procedural deprivationsthe denial of counsel, of compulsory process, of cross-examination, or of a jury trialby simply declaring, no harm, no foul.
This is assuredly not how Mathews meant to measure due process. While the Mathews test is contextually based and flexible, it is at bottom an interest analysis, not an outcome analysis. It focuses not on whether a procedural error produced an unfair outcome but rather on whether the error produced an unjustifiable risk of erroneously denying a protected interest in the specific procedural setting at hand"the risk of an erroneous deprivation of such interest through the procedures used."[23]
Here, viewing the error at issue in its specific procedural context, I would conclude that it posed an intolerable and unjustifiable risk of prejudicing the fairness of the process by which the court determined D.M.'s vitally important interest in retaining maternal ties to her children. Based on this conclusion, I would find a violation of procedural due process. And only then would I engage in a particularized harmless error analysis. The court has the analysis backwards.[24]

B. Harmless Error

The court's opinion is no more persuasive as a decision grounded in harmless error than as one grounded in procedural due process. This is not a situation in which judicial error denied procedural rights in an action between private litigants. Here the state denied procedural fairness to a parent against whom it prosecuted an action for termination of parental rights. I believe that when the state brings its power to bear against one of its citizens by initiating such a proceeding and then commits fundamental constitutional error, it should bear the burden of proving that the error was harmless.[25]
In requiring D.M. to shoulder the burden of establishing exactly how she was prejudiced by constitutional error, the court rewards the state's misconduct. It also effectively shifts to D.M. a burden that the law originally assigned to the state. Though D.M.'s parental rights were determined through a fundamentally flawed process, the court's harmless error analysis forces D.M. to bear the burden of proving that her ties to her children should not have been terminated.
Moreover, even assuming that D.M. should be made to bear the burden of proving prejudice, the record fails to support the court's decision that she has failed to meet her burden. The court sees "no basis for concluding that the untimeliness of the state's request harmed D.M."[26] But the reasons it advances to support this finding are unpersuasive.
The court points primarily to the lack of any solid record of possible prejudice. Finding no plausible basis to support D.M.'s claim of prejudice at the original hearing, the court notes that if a new adjudication hearing had been held immediately before D.M.'s 1997 disposition hearing, there is "no reason to think [that] the [trial] court's findings on [the CINA status] issue, based on the same evidence, *220 in 1997 would have differed from its findings in 1995."[27] Extolling the quality of legal representation that D.M. actually received, the court faults D.M. for failing to advance "any plausible basis for finding that she was actually prejudiced" by lack of notice or by being deprived of a more experienced attorney.[28]
But the court's perfunctory dismissal of possible prejudice, and its emphasis on the competence of the representation D.M. actually received, are unwarranted. Experience teaches that skill and experience in lawyering can often yield surprising successes. While the court seems to reason from the length of D.M.'s hearing, the large number of witnesses that her attorney called, and the strength of the state's case against her that another attorney would have done little more, the court's reasoning mistakenly assumes that experienced counsel would simply have attempted to do more of what D.M.'s original counsel actually did.
An experienced attorney skilled in defending against termination might have pursued entirely different strategies for prehearing motions and negotiations; might have planned a defense specifically designed to steer toward a CINA adjudication based on a mere preponderance of the evidence; might have used a different approach in the selection and preparation of witnesses; might have channeled limited prehearing resources into alternative, therapeutic interventions; and might have exercised more effective client control to ensure the success of those alternative efforts.
In short, the fact that D.M.'s original counsel provided zealous and effective representation despite her inexperience provides no basis for assuming that more experienced counsel would not have done better and could not have made a difference. When error affects the quality of legal representation, we should more readily presume prejudice than harmlessness from a silent record.
And in any event, the record convincingly demonstrates that D.M. lacked a reasonable opportunity to carry the burden that the court accuses her of ignoringthe burden of showing specific prejudice.
On the opening day of the adjudication hearing, when the state first requested findings by clear and convincing evidence and D.M. objected, the trial court expressed doubt that she would be prejudiced by this higher standard of proof; but the court did not squarely rule on the issue, deferring a ruling until the conclusion of the hearing. At the end of the adjudication hearing, however, the court entered findings by clear and convincing evidence and again deferred ruling on D.M.'s objection, leaving the issue open pending the state's final decision as to whether it would actually petition for termination. D.M. thus had no occasion to make a record on her claim of error before the adjudication hearing ended.
Nor was she able to do so after the hearing. The state petitioned for termination within days after the trial court entered its written adjudication findings; its petition relied on the adjudicative findings that the court had established by clear and convincing *221 evidence. D.M. promptly objected to the state's reliance on these findings and moved for a finding "that there has been no evidence presented on the termination petition presently pending before the court."
The trial court subsequently convened a hearing to consider this motion and other matters. At the hearing, D.M. expected to call witnesses, including the Public Defender Agency's supervising attorney in Palmer, to establish precisely how the state's failure to provide adequate notice had prejudiced her case at adjudication. But D.M.'s plans ran aground on the state's objections. The state's attorney argued that D.M. appeared to be attempting to establish that she had received ineffective assistance of counsel. Insisting that this attempt placed D.M.'s counselthe Public Defender Agencyin a position of conflict, the state requested appointment of independent counsel to represent D.M.
D.M.'s public defender vigorously protested that he was not seeking to show ineffective assistance of counsel. Characterizing the state's request for appointment of an independent attorney as a tactic aimed at depriving D.M. of zealous representation, D.M.'s attorney insisted that D.M.'s sole purpose in seeking an evidentiary hearing was to make a record of the prejudice that she had suffered at the adjudication hearing due to the state's failure to give adequate notice:
And again, I would just note that I don't think it's an ineffective assistance issue. The issue is brought down to what kind of resources in terms of experts would have been hired, and all kinds of other issues involving the amount of resources that would have been put into a case had the mother and counsel known that the case was a termination case. So it's not an ineffective [assistance of counsel] issue. It boils down to notice. And there's no need, as the court previously addressed, for the agency to withdraw so that we can put on evidence that we didn'tthat the mother didn't know, when they walked into the adjudication hearing, that it was in fact a termination hearing. It's not complex.
Ultimately, the hearing adjourned for unrelated reasons without any testimony being presented. The independent counsel issue remained unresolved when the hearing ended.
After the hearing adjourned, the state filed a motion for appointment of independent counsel, advancing the same theory it had raised at the hearing. The superior court accepted the state's conflict of interest argument and appointed independent counsel to consult with D.M. This appointment threw the status of D.M.'s representation into procedural limbo. Nine months after the hearing, when the court next convened for a status conference, D.M.'s independent counsel appeared but expressed uncertainty concerning her role. Meanwhile, the public defenders who originally represented D.M. were replaced by a public defender who seemed unfamiliar with the background of the case.
D.M.'s new public defender asked for a ruling on the still-pending motion to decide the effect of the court's original adjudication findings, professing uncertainty as to whether a hearing would be needed to resolve the issue:
[W]e need to know, as we go into a termination hearing, whetheror how the court's going to rule on the issue of whether the clear and convincing standard which was applied at adjudication is going to be incorporated into the dispositionor into the termination hearing. We probably also need a resolution of the question of ineffective assistance of counsel, though I'm not quite sure how that works. But, in awe do need to know what issues are going to be litigated, and if clear and convincing standards arefindings are going to be used by reference, then we need to know that. I don't know whether a hearing is required on that or not. Whether the briefing is complete or not might be a question that Your Honor could best answer.
The trial courtits own memory of the case evidently fading after the nine-month hiatusresolved these uncertainties by mistakenly informing the parties that the only issue left to be decided was whether the state's late request for clear and convincing *222 evidence findings had deprived D.M. of effective representation. The court erroneously stated that the Public Defender Agency had "wanted independent counsel, and everybody thought it was a good idea, for independent counsel to advise [D.M.] as to whether she really wanted to move for the PD to withdraw and claim that they'd been incompetent in representing her, that they didn't adequately advise her about the termination issues." According to the court, independent counsel's sole purpose was to consult with D.M. and assist her in raising such a claim if D.M. wished to pursue it. The court explained that unless D.M. claimed ineffective assistance of counsel, the matter was closed, "we just keep going" with a disposition hearing.
At the next scheduled hearing, D.M.'s independent counsel notified the court that D.M. would not be filing a motion requesting withdrawal of the Public Defender Agency. After discharging independent counsel, the court indicated that it was prepared to set the case for disposition. The state reminded the court that D.M.'s motion objecting to the adjudication findings had not yet been decided; the state asked if it "would be possible to address that issue." The court, turning to D.M.'s public defender responded: "Mr. Davenport, unless you have any objection, I'm going to go ahead and address it."
D.M.'s counsel told the court that he understood that this issue had already been briefed, but said that he was not prepared to argue it: "I'm notI guess I'm not on notice that we were going to be arguing it today. That's the only problem I have." The court replied by declaring that there was no need "to invite oral argument on every motion ... I'm ready to rule without any oral argument unless any party objects to the court going ahead and ruling. Then I'm going to go ahead and deny the mother's motion[.]" Hearing no objection, the court proceeded to find, "It seems abundantly clear to me that [D.M.] was aware that [termination] was in issue. But, even if, for some reason, she really weren't aware, it[']s abundantly clear that she fought everything, and was defended vigorously and competently, and therefore the outcome wouldn't be any different, and there really wouldn't be any prejudice is what the court is saying."
These circumstances hardly support a finding that D.M. received a fair opportunity to show prejudice. The trial court effectively derailed D.M.'s initial attempt to show prejudice by characterizing D.M.'s attempt as an effort to claim ineffective representation and, on that basis, appointing independent counsela characterization that D.M.'s public defender adamantly opposed. Later, after sua sponte declaring ineffective assistance of counsel to be the only remaining issue and after learningpredictablythat no claim of ineffective assistance would be raised, the court announced that it was "ready to rule... unless any party objects."
Admittedly, D.M.'s new public defender failed to object. But consider the situation: He was unfamiliar with the background of the notice issue; the court had earlier misinformed the parties that the public defender was the party that originally "wanted independent counsel, and everybody thought it was a good idea"; D.M.'s public defender had just finished telling the court that he was unprepared to address the issue of notice because he had been given no warning that it would be heard; and to this the court had responded that it saw no need to invite oral argument on every issue, that the matter had already been fully briefed, and that the court was ready to rule.
Obviously bent on ruling immediately, the trial court had clearly signaled D.M.'s new attorney that there was no good reason to object. It hardly seems surprising, then, that D.M.'s attorney declined to press the issue. On these facts, I would conclude that D.M. did not receive a fair chance to establish prejudice.

III. CONCLUSION

For the foregoing reasons, I would hold that the trial court violated D.M.'s right to due process by relying on its adjudicative findings to terminate D.M.'s parental rights. Because neither party has had an adequate opportunity to demonstrate whether this error resulted in prejudice, I would remand for a hearing on harmless error and would require that the state bear the burden of proof *223 on remand. Accordingly, I dissent from the decision affirming the superior court's termination order.

APPENDIX

EXCERPTS FROM "FINDINGS, CONCLUSIONS, AND ORDER TERMINATING PARENTAL RIGHTS AND RESPONSIBILITIES"
6. The minors, who are under eighteen (18) years of age, were shown to be children in need of aid pursuant to AS 47.10.010(a)(2)(a), (b), (c), (d), and (f) with respect to the mother, [D.M.], by clear and convincing evidence on September 9, 1995.
....
8. Additionally, the court makes the following findings based on evidence presented during the termination hearing on June 16, 17, 18, 23, and 24:
a. That the Division of Family and Youth Services has been involved with [D.M.'s] family formally and informally since 1986.
b. That the mother, [D.M.], suffers from post traumatic stress disorder and personality disorder.
c. That neither the mother nor the father are able to provide safe, stable living environments for the children.
d. That despite years of recommended individual mental health counseling from all mental health professionals involved with the mother, [D.M.] has made no positive fundamental changes in her behaviors and has experienced only limited progress in therapy.
e. That throughout 1997 numerous teenagers have consistently spent weekends at [D.M.]'s house. [D.M.] has allowed these teenagers, including minors, to regularly engage in risky behaviors including drinking, drug use, and sexual activity while in her home.
f. That [D.M.] has been participating in regular alcohol use since the winter of 1995, including instances of drinking and driving with teenagers in her vehicle.
g. That [D.M.] has used alcohol and marijuana with teenagers in her home. That [D.M.] has demonstrated as recently as June of 1997 conduct constituting failure to protect when [D.M.] acting in an adult caretaker role with respect to a minor, failed to prevent or curtain physical and/or emotional harm to the minor.
9. Accordingly, the court further finds based on the evidence presented that the evidence clearly and convincingly establishes that all five children continue to be severely emotionally disturbed and the mother continues to demonstrate an inability to adequately care for their special needs.
10. That the evidence is clear and convincing in establishing that the mother continues to demonstrate a lack of understanding regarding the physical, emotional, mental and social needs of her children so that it is likely that all five children would continue to suffer substantial neglect if the mother's parental rights were not terminated.
11. That the evidence demonstrates clearly and convincingly that all children would remain at imminent and substantial risk of suffering substantial physical harm due to conditions created by [D.M.] and [S.M.] if their parental rights were not terminated.
12. That there is clear and convincing evidence that the children would be at imminent and substantial risk of being sexually abused due to conditions created by [D.M.] and [S.M.] if their parental rights were not terminated.
....
14. That the evidence is clear and convincing that [D.M.] has been and continues to be unable to change her basic parenting behavior. That this behavior has been and continues to be highly detrimental to the childrens' welfare. Based on the opinions of Dr. Rose and Dr. Holiday, the court believes that the evidence is clear and convincing in establishing that the mother's conduct is likely to continue.
....
17. That the evidence is clear and convincing in demonstrating that the childrens' underlying psychological damage is not a result of their removal from the home of the mother or lack of visitation with the mother *224 subsequent to removal but rather the damage results from conditions existing in the home prior to their removal. That there is evidence beyond a reasonable doubt that return of the children to the custody of the mother is likely to result in serious emotional or physical damage to the children.
NOTES
[1] The children were born in 1983, 1984, 1985, 1987, and 1988. D.M. is also the mother of R.B. (born in 1979), although her parental rights with respect to him are not at issue here. Our references to "the children" do not include R.B. We have altered the first initials of D.M., S.M., and R.B. to prevent their identification.
[2] The superior court consolidated adjudication and termination issues with respect to the children's father, S.M. Finding by clear and convincing evidence that the minors were children in need of aid, and that his conduct was likely to continue, the court terminated S.M.'s parental rights. S.M. is not appealing that decision.
[3] See A.M. v. State (A.M. II), 945 P.2d 296, 302 (Alaska 1997); DeVaney v. State, Dep't of Revenue, 928 P.2d 1198, 1200 (Alaska 1996).
[4] See E.M. v. State, Dep't of Health & Soc. Servs., 959 P.2d 766, 768 (Alaska 1998).
[5] Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).
[6] See E.J.S. v. State, Dep't of Health & Soc. Servs., 754 P.2d 749, 750 n. 2 (Alaska 1988).
[7] Supreme Court Order 1355 amended CINA Rules 15 and 18, effective July 15, 1999. Because we affirm the superior court's 1997 termination of D.M.'s parental rights, these amendments do not apply here. It is not necessary to discuss the procedures the amended rules require.
[8] CINA Rule 18(a) (1998) provided:

Petition. The Department may file a petition seeking termination of parental rights combined with or after the filing of a petition for adjudication for that child as a child in need of aid. The title of the petition must clearly state that termination of parental rights is sought. A petition for termination of parental rights must be served as provided by CINA Rule 7(d).
[9] See CINA Rule 18(a), (c) (1998).
[10] See CINA Rule 18(a) (1998).
[11] See CINA Rule 18(b) (1998). See, e.g., O.R. v. State, Dep't of Health & Soc. Servs., 932 P.2d 1303, 1306-07 (Alaska 1997) (discussing stages occurring separately), appeal after remand, 968 P.2d 93 (Alaska 1998).
[12] See CINA Rule 15(c) (1998).
[13] See CINA Rule 15(c), 18(c)(1) (1998). Per CINA Rule 18(c)(1) (1998), before parental rights could be terminated, DFYS was required to prove "by clear and convincing evidence that either the parental conduct that caused the minor to be adjudicated a child in need of aid is likely to continue unless parental rights are terminated, or the requirements of AS 25.23.180(c)(2) or (3) have been met...."
[14] See V.D. v. State, Dep't of Health & Soc. Servs., 991 P.2d 214, 216 (Alaska 1999) ("[T]he relevant question at adjudication should be whether the child is presently at risk, not whether a risk existed some months earlier.").
[15] See CINA Rule 15(c) (1998).
[16] See AS 25.23.180(c)(2) or (3) (1999); CINA Rule 18(c)(1) (1998).
[17] CINA Rule 15(c) (1998). Although CINA Rule 15(c) (1998) stated that the preponderance standard applied when CINA status was adjudicated, that rule also provided that the court "may not terminate parental rights under CINA Rule 18" absent proof by clear and convincing evidence at the adjudication hearing that the child was CINA as a result of parental conduct.
[18] See CINA Rule 18(a)(1) (1998).
[19] See CINA Rule 18(c)(1) (1998).
[20] See CINA Rule 18(c)(1)(A)(ii) (1998).
[21] We note, however, that D.M.'s counsel asserted at the termination hearing that the department's intent to terminate parental rights had been a "matter of record." And in her reply brief, D.M. stated that she "certainly suspected that [DFYS] was contemplating pursuing termination of parental rights at some time in the future."

The guardian ad litem contended in her appellate brief that D.M. had acknowledged awareness of the state's intent to terminate by writing comments on a case plan. The record does not contain a copy of the case plan showing D.M.'s receipt, nor would it be appropriate for us to take judicial notice of that document.
[22] She cites V.F. v. State, 666 P.2d 42, 46-47 n. 5 (Alaska 1983). See also Jerrel v. State, 851 P.2d 1365, 1372 (Alaska App.1993) (holding that a criminal defendant does not have a right to appointed counsel of her choice).
[23] See CINA Rule 18(c)(1) (1998).
[24] 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). See also City of Homer v. State, Dep't of Natural Resources, 566 P.2d 1314, 1319 (Alaska 1977) (looking to Mathews v. Eldridge to determine whether administrative procedure met requirements of due process).
[25] Mathews v. Eldridge, 424 U.S. at 334-35, 96 S.Ct. 893 (citations omitted).
[26] In re J.L.F. & K.W.F., 828 P.2d 166, 170 (Alaska 1992), overruled on other grounds by In re S.A., 912 P.2d 1235 (Alaska 1996).
[27] 424 U.S. at 335, 96 S.Ct. 893.
[28] See Dissent at 220.
[29] See, e.g., North State Tel. Co. v. Alaska Pub. Utils. Comm'n, 522 P.2d 711, 714 (Alaska 1974). See also Smith v. State, Dep't of Corrections, 872 P.2d 1218, 1223-24 (Alaska 1994) (reviewing prisoner's due process arguments in "context of what happened to Bynum, not what might happen" and holding that under circumstances Bynum's due process rights were not violated); In re K.L.J., 813 P.2d 276, 282 (Alaska 1991) (involving parent without counsel in termination proceeding); In re J.H.B., 578 P.2d 146, 148 (Alaska 1978) (finding no due process violation in part because minor in juvenile waiver hearing did not indicate how parents' absence might have prejudiced him).
[30] See North State Tel., 522 P.2d at 715 ("We conclude that, in the circumstances of this case, the notice was adequate to apprise North State of the nature of the case it would have to meet.").
[31] Matanuska Maid, Inc. v. State, 620 P.2d 182, 192 (Alaska 1980).
[32] See id. at 193.
[33] Id. (holding that, because appellants actually availed themselves of right to challenge investigative demand, appellants were not prejudiced by lack of notice and hence were not denied due process); see also Kerr v. Kerr, 779 P.2d 341, 342 (Alaska 1989); cf. Lankford v. Idaho, 500 U.S. 110, 119-28, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991) (finding due process violation where defendant had no knowledge that judge was considering imposing death penalty).
[34] See A.M. v. State (A.M. I), 891 P.2d 815, 825 (Alaska 1995); see also In re H.C., 956 P.2d 477, 484 (Alaska 1998) (affirming superior court's determination that parent's recent efforts to address mental health issues were outweighed by other testimony in record and, thus, that parent's neglectful behavior was likely to continue).
[1] Op. at 209.
[2] Former AS 47.10.080(c)(3); former CINA Rule 18(c).
[3] See former AS 47.10.010; CINA Rule 15(c).
[4] See, e.g., Boyles v. State, 647 P.2d 1113, 1116 (Alaska App.1982) (quoting Restatement of Judgments (Second) § 68 (Tent. Draft No. 1, 1973)) (defining collateral estoppel to apply only "[w]hen an issue of fact or law is actually litigated and determined by a final and valid judgment and the determination is essential to the judgment").
[5] Op. at 210.
[6] See former AS 47.10.080(c).
[7] The record does indicate that D.M. was aware early on that the state had adopted termination as its ultimate goal in the CINA proceedings. But nothing in the record suggests that the state gave her any advance notice of its plan to use the adjudication hearing as the first stage of its termination effort. The crucial issue with respect to notice is not whether D.M. was aware of the state's ultimate goal, but whether she knew that the state would actually start trying to reach that goal at the adjudication hearing.
[8] 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
[9] Flores v. Flores, 598 P.2d 893, 895 (Alaska 1979).
[10] 666 P.2d 1044, 1046 (Alaska 1983).
[11] Id.
[12] I do not assert, as the court suggests I do, Op. at 210-211, that D.M. had a right to "pick and choose among appointed counsel" or that she was entitled to appointment of a more experienced counsel. But D.M. asserted without challenge that the policy of her counsel's employer, the Public Defender Agency, was to assign termination cases to senior attorneys who had experience in handling such matters; thus, had prior notice been given, D.M. evidently would have received more seasoned counsel. While D.M.'s counsel unquestionably provided her with competent representation, it would be hard to gainsay that a more experienced, specifically trained attorney might have done better. In this regard, it is particularly disturbing that the court dismisses this aspect of prejudice as legally irrelevant, declaring, without citing any authority, that "[t]he proper question is whether counsel was ineffective." Op. at 213. This declaration effectively announces that the state, in its capacity as an opposing litigant, is free to interfere with the Public Defender Agency's case-specific strategies for matching counsel and clientssubject only to the bottom-line requirement that its interference not result in a client's receiving ineffective assistance of counsel. I know of no support for such a proposition.
[13] 527 P.2d 472 (Alaska 1974).
[14] Id.
[15] Id.
[16] Id. at 474.
[17] Op. at 212.
[18] Op. at 213.
[19] Op. at 214.
[20] Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
[21] Id.
[22] Smith v. State, Dep't of Corrections, 872 P.2d 1218, 1223-24 (Alaska 1994).
[23] Mathews, 424 U.S. at 334-35, 96 S.Ct. 893.
[24] In attaching as an appendix to its opinion the superior court's termination findings, the court tacitly acknowledges a view that a parent's right to procedural due process declines in direct proportion to the strength of the state's casethat the more evidence of bad parenting there is, the less process the parent is due.
[25] See First Federal Bank, FSB v. Gallup, 51 Conn.App. 39, 719 A.2d 923, 925 (1998) (quoting State v. Vitale, 197 Conn. 396, 497 A.2d 956 (1985) ("It is a fundamental rule of appellate review of evidentiary rulings that if error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling that was probably harmful to him.") (emphasis added)); 5 Am.Jur.2d § 709 at 377 (1995) (citing Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) for the proposition that in federal civil cases, "[i]f an error is of such a character ... that its natural effect is to prejudice a litigant's substantial rights, the burden of sustaining the verdict is on the appellee"). Cf. Bostic v. State, 805 P.2d 344, 346-47 (Alaska 1991) (shifting to the state the burden of disproving prejudice for non-constitutional discovery violations in criminal cases).
[26] Op. at 210.
[27] Id.
[28] Op. at 210-211. The court also suggests that D.M. somehow remained free to resurrect the issue of CINA status at the disposition hearing, faulting her for failing to "ask the superior court to reopen the issue of the children's 1995 CINA status or make different findings about D.M.'s pre-adjudication hearing conduct, although that would have been a logical thing to do if there were additional or late-discovered evidence." Op. at 211. But the court's perception of "the logical thing to do" utterly ignores the state's central reason for requesting reliance on the original CINA findingsa reason that the trial court implicitly accepted in granting the state's request: that the doctrine of collateral estoppel would bar D.M. from relitigating any aspect of the CINA adjudication. The court further suggests that D.M. could somehow have raised the issue of CINA status at the disposition hearing while litigating the question of whether the conduct causing the children to be adjudicated CINA was likely to continue. Op. at 211. But this seems akin to suggesting that a convicted offender can mitigate prejudice resulting from an unfair conviction by arguing innocence in support of a lighter sentence. Predictably, such arguments are rarely successful. The point of D.M.'s claim is not that she was foreclosed from admitting evidence of her pre-adjudication conduct at the termination hearing; the point is that she was precluded from admitting it on the issue she wanted to litigateher children's CINA status.